### In re ESTATE OF Robert M. MUMMA, Deceased.

**Appeal of Robert M. Mumma, II.**

Superior Court of Pennsylvania.

Submitted Oct. 25, 2011.

Filed Feb. 22, 2012.

Reargument Denied April 26, 2012.

butions.

Robert M. Mumma, appellant, pro se.

Brady L. Green, Philadelphia, for Morgan, appellee.

Linda Mumma Roth, appellee, pro se.

BEFORE: DONOHUE, OLSON and STRASSBURGER*, JJ.

OPINION BY DONOHUE, J.:

Appellant, Robert M. Mumma, II ("Mumma II"), appeals the order of the Orphan's Court dated March 4, 2011, denying his Motion for Disqualification and Removal of Lisa M. Morgan ("Morgan") as Executrix and Trustee Due to Conflict of Interest (hereinafter, the "Motion for Disqualification").[1] For the reasons that follow, we affirm the trial court's order.

Robert M. Mumma, Sr. ("Mumma Sr.") died on April 12, 1986. In his will, he established two trusts, a marital trust and a residual trust. He named his wife, Barbara McK. Mumma ("Mrs. Mumma") and Morgan, one of his daughters, as the two trustees of both trusts and co-executrixes of his estate. On July 10, 2010, Mrs. Mumma died, and Morgan then became the sole trustee of the two Mumma, Sr. trusts. Mrs. Mumma named Morgan as the executrix of her estate and principal beneficiary of her will, and Morgan also serves as the sole trustee of a trust Mrs. Mumma established during her lifetime, of which Morgan is the sole beneficiary.

In 2004, Mrs. Mumma and Morgan filed a final accounting for Mumma, Sr.'s estate, including a fourth interim account for the marital trust and a third interim account for the residual trust. In response, Mumma II and his sister, Barbara M. Mumma ("B.M. Mumma"), filed numerous objections to the accounts, and Mumma II also filed numerous motions. Beginning in April of 2009 and continuing through June 16, 2010, a court-appointed auditor presided over thirty-three days of hearings in an effort to resolve these objections and motions. Following Mrs. Mumma's death in July 2010, Morgan filed final accounts for the Mumma, Sr. trusts and petitioned the trial court for confirmation. Mumma II and B.M. Mumma again filed numerous objections, which were in turn referred to the court-appointed auditor, who conducted more hearings. On September 17, 2010, pursuant to the First Codicil to Mumma, Sr.'s will, B.M. Mumma became the successor co-executrix of his estate to replace Mrs. Mumma.

On September 9, 2010, Mumma II filed his Motion for Disqualification. Therein, he acknowledges that this constitutes the fourth motion/petition he has filed since 1989 seeking the removal of Morgan as the executrix of Mumma, Sr.'s estate and trustee of the marital and residual trusts.[2] On

---

* Retired Senior Judge assigned to the Superior Court.

1. The trial court's order is appealable under the collateral order doctrine. Pa.R.A.P. 313; *see, e.g., In Estate of Georgiana*, 312 Pa.Super. 339, 458 A.2d 989, 991 (1983) ("We find that an order denying a petition for removal of an executor is a final order proper for appellate review."), *affirmed*, 504 Pa. 510, 475 A.2d 744 (1984); *Matter of Estate of Velott*, 365 Pa.Super. 313, 529 A.2d 525, 527 (1987) (order denying petition for removal of executrix "is appealable under the collateral order doctrine").

2. Mumma II's litigiousness with respect to his father's estate is not limited to motions/petitions to disqualify Morgan, as he has filed multiple lawsuits (both in Cumberland County and in Florida) seeking to obtain ownership of various assets. Since the late 1980s, he has also filed numerous motions, applications, and petitions in the trial court in opposition to Morgan's efforts to resolve estate issues. To this end, he has frequently appealed the orders of the trial court to this Court. *See, e.g.,* Notices of Appeal filed September 15, 2005 (1546 MDA 2005) and January 14, 2009 (270 MDA 2009)—both of which were subsequently quashed by Orders of this Court. In fact, the present appeal was docketed con-

January 28, 2011, the trial court conducted an evidentiary hearing on the Motion for Disqualification. In its written opinion pursuant to Pa.R.A.P. 1925(a), the trial court provided the following review of that hearing:

As was evident at the January 28, 2011 hearing, and from his [Motion for Disqualification], hearing brief, and post-hearing brief, [Mumma II] contended that [Morgan's] dual roles as executrix and primary beneficiary of the Estate of Mrs. Mumma and Co–Executrix and trustee in the Estate of [Mumma, Sr.], established a conflict of interest, resulting in a breach of [Morgan's] fiduciary duties through her failure "to avoid placing herself in a position where her own interests ... enter into conflict—or may possibly conflict—with the interests of the Estate and Residuary Trust and/or the said beneficiaries thereof."

At the hearing, [Morgan] confirmed that she was the sole executrix and primary beneficiary of the Estate of Mrs. Mumma in Florida, and that she first became aware of a certain trust that Mrs. Mumma had established prior to her death, and which apparently ultimately inured to [Morgan's] benefit, shortly before Mrs. Mumma's death. She testified that, pursuant to the marital trust, "[Mrs. Mumma] had an absolute right to a five-percent draw" to income, whether derived from the residuary or marital trust. In response to [Mumma II's] inquiry which related to an alleged over-funding of the marital trust, [Morgan] testified that "[she] believe[d any over-funded money would go] back into the residuary trust," which had "the same beneficiaries as the marital trust."

[Morgan] further testified that certain shares of a corporation listed in an inventory of the Estate of Mrs. Mumma were purchased by Mrs. Mumma prior to her death. On cross-examination, [Morgan] testified regarding the right to income Mrs. Mumma was entitled to receive from the residual and marital trusts under the will of [Mumma, Sr.], as follows:

Q: Did that payment of income [from the residual and marital trusts] to [Mrs. Mumma] cease as of [Mrs. Mumma's] death?

A: Yes.

Q: So no income on trust assets has been paid to her estate since her death?

A: Correct

\* \* \*

Q: And you have not purported as an executor of her estate to try to pull down any assets from the trust, correct?

A: Correct. My understanding is that that benefit that [Mumma, Sr.] provided [to] her ceased upon her death as well.

With respect to her administration of the estates since Mrs. Mumma's death, [Morgan] testified that she had not engaged in any transaction that would transfer assets from her father's estate to her mother's estate, of which she was the primary beneficiary:

Q: Have you engaged in any transaction in which an asset of the residu-

al trust or the marital trust under [Mumma, Sr's] will was transferred to your mother's estate?

A: No.

Q: Do you have any contemplated transactions to take any assets from the trusts under [Mumma, Sr's] will that are [i]n adjudication here in Carlisle and transfer them to your mother's estate?

A: No.

[Morgan's] actions and intentions to which she testified at the hearing were further supported by an August 27, 2010 communication sent by her to [Mumma II] and to Co-Executrix [B.M. Mumma], which was in response to a request for information about certain assets:

> Ms. Morgan does not intend as trustee to sell or otherwise dispose of real estate, stock or other noncash assets in the trusts ... without seeking and obtaining prior approval of the Orphans' Court.

As to the progress being made toward dissolving the trusts, [Morgan] testified that, "[w]e have already obtained the real estate appraisals. We hired an appraisal agency, and they concluded the appraisals, and time flies, but within the last month or so, we forwarded [the appraisals] to the other beneficiaries." Additionally, [Morgan] testified to her intentions and plans to properly dissolve the trusts as follows:

> Q. What is your ultimate plan as to how to bring an end to the administration of the two trusts under your father's will?
>
> A: Once we have all of the values, it is my intent to seek from the beneficiaries, if they have any specific interests in any particular asset that they would like to have, and I believe ... [in] that October meeting ... I asked them if they had

any particular asset they were interested ·in for cash or whatever, to give me some indication.

> So my plan is to seek that and then to—based on that to prepare a plan of dissolution for presentation to the Court for Court approval that it is okay, and then if the Court says it is okay, or the Court makes an adjustment to it, to dissolve the trust on that basis.
>
> Q: And to distribute the assets to the beneficiaries?
>
> A: Correct.

At the hearing and as evident in his Post–Hearing Brief, [Mumma II] contended that Items Seventh, Eighth, and Tenth in the will of [Mumma, Sr.], entitled him to distribution of certain assets, and required [Morgan] to make prompt distribution at the time of Mrs. Mumma's death. Item Seventh which, *inter alia,* established the Marital Trust, stated:

> Upon the death of [Mrs. Mumma], the principal of this Trust, as it is then constituted, shall be paid over by my surviving trustee unto my children, [MUMMA II], [B.M. MUMMA], LINDA M. ROTH and LISA M. MUMMA, free of this Trust, share and share alike, per stirpes and not per capita.

Item Eighth which, *inter alia,* established the Residuary Trust, provided:

> Upon the death of [Mrs. Mumma], the principal of this Trust, as it is then constituted, or, if [Mrs. Mumma] does not survive me, upon my death, my residuary estate, shall be paid over by my surviving trustee or by my successor Executor, as the case may be, unto my children, [MUMMA II], [B.M. MUMMA], LINDA M. ROTH and LISA M. MUMMA, free of this

Trust, share and share alike, per stirpes and not per capita.

\* \* \*

The Trustees shall be vested with reasonable discretionary powers and in all matters not otherwise herein specifically provided, they shall exercise their sound judgment and discretion in the performance of their duties hereunder. They shall not be liable for any error of judgment provided that such error is honestly made.

Item Ninth, which, *inter alia*, defined the powers granted under the will to the Trustees, indicated the decedent's intent to provide the estate's trustees with broad discretion in distributing the estate's assets:

I give and grant unto my trustees . . . the following powers, which shall be construed broadly and which may be exercised by them in either or both capacities, as in their discretion they deem advisable, in addition to and not in limitation of their common law and statutory powers:

\* \* \*

(10) To receive or make distribution of any trust herein created, either in money or in kind, or partly in money and partly in kind. The judgment of the trustees as to what shall constitute an equitable distribution or apportionment shall be binding and conclusive upon the beneficiaries hereof. Nothing herein contained, however, shall empower the trustees to make distribution before the time or times specified herein.

(11) To pay, collect, compromise, sue for or contract any claim or other matter, directly or indirectly, affecting the trusts.

\* \* \*

(18) As to each Trust created herein, to exercise all the powers granted and all the duties imposed herein until such time after the termination of that Trust as the property included in that Trust has been fully distributed, and to do all other acts which, in their judgment, may be necessary or appropriate for the proper or advantageous management, investment, or disposition of any property included in any Trust created herein.

Item Tenth, stated in its entirety, provided as follows:

The rights, titles, benefits, interests and estates of any beneficiary hereunder, including beneficiaries under the Trusts herein created shall not be subject to the rights or claims of his or her creditors not subject nor liable to any process of law or court, nor subject to an assignment or transfer, voluntary or involuntary, by a beneficiary hereof to another, and all of the income, principal or other benefits from or under any Trust herein created, or this Estate, shall be payable, and deliverable only, wholly exclusively and personally to the designated beneficiaries hereunder at the time the designated beneficiaries are entitled to take the same under the terms of this instrument.

[Mumma II] testified as to his opinion that [Morgan's] dual roles as Executrices of two estates resulted in a disqualifying conflict of interest. At the hearing, [Mumma II] testified as to certain inactions of [Morgan] which had occurred prior to the death of Mrs. Mumma, and, therefore, prior to [Morgan's] appointment as executrix of the Estate of Mrs. Mumma. [Mumma II] testified that it was his belief that " . . . [Mrs. Mumma and Morgan] . . . conspired with their attorneys to divert those assets from my father's estate and

to sell them," and that certain stock in closely held corporations had been improperly diverted to corporations controlled by Mrs. Mumma. [Mumma II] conceded that the bases for these allegations against [Morgan] had been referred to the court-appointed auditor. In an attempt to guide [Mumma II's] monologue for purposes of providing him an opportunity to fully state the bases for his positions, the undersigned judge questioned [Mumma II] as to what actions or inactions of [Morgan] he was complaining about:

Court: And what else did they do that you think was wrong, and specifically what did [Morgan] do?

[Mumma II]: [Morgan] stood by and participated in all of this knowing that they were—that they were setting up another trust, a third trust for her benefit, and solely her benefit.

Court: Okay. What other conflict do you see?

[Appellant]: The conflict is we have raised claims in Florida about—and we have litigation up here about this. I don't think [the court-appointed auditor] ever dreamed that they had diverted these assets from the trusts my father set up to a new trust solely for the benefit of [Morgan] and her family, but that is what they have done, and they kept it a secret, and Morgan, Lewis & Bockius did it for them.

And I have an objection to Morgan, Lewis & Bockius representing her in this issue because they were my attorneys at the time they did this, they put this deal together, and they should have told me about it and they should have told me about the conflict.

Court: What other conflict do you see that [Morgan] has in serving in these dual capacities?

[Appellant]: Well, because the capacity she is in gives her the ability to decide what assets she is going to get, and as part of this plan she is going to distribute assets to everybody, and she is the only one that knows anything about them. And that is not what my father's intention was. It is not what his will calls for. It is not equal shares, it is share and share alike. Everybody's share is supposed to be the same, not a combination of some people get more cash, some people get more real estate. Everybody gets a quarter of what is in those trusts, and that was the intention when they formed the tenancy in common.

On cross-examination conducted by Co–Executrix [B.M. Mumma], who was similarly acting *pro se* at the hearing, [Mumma II] admitted that [Morgan] had recently completed conducting certain appraisals, that copies of those appraisals were in [Mumma II's] possession, and that he did review those appraisals, albeit shortly before the January 28, 2011 hearing. On cross-examination conducted by [Morgan's] counsel, [Mumma II] further testified that he objected to his mother's alleged misappropriation of certain assets that [Mumma II] believed she was not entitled to under his father's will:

Q: You understood that [Mrs. Mumma] said she had a right [to scoop out certain corporate assets]?

A: Well, first of all, [Mrs. Mumma] violated the shareholder's agreements.

Q: You understood that [Mrs. Mumma] had purported to take that stock out and transfer it to the marital trust, and then to scoop it out and transfer it to herself in her own name ... ?

A: Yes, but I didn't know what percentage or which share [Mrs. Mumma] took.

Q: But you knew then also that [Mrs. Mumma] regarded that as her personal property?

A: I know [Mrs. Mumma] sold a lot of it to CRH for a lot of money like tens of millions of dollars, and I don't know where that ended up, but it wasn't [Mrs. Mumma's] stock. That was stock that my grandfather gave to me and my sisters, and I can prove that.

Trial Court Opinion, 6/1/11, at 12–21.

By order dated March 4, 2011, the trial court denied the Motion for Disqualification. This timely appeal followed, in which Mumma II raises the following six issues for our consideration:

1. Whether [Morgan] is subject to removal as Co–Executrix and Trustee of [Mumma, Sr.'s] Estate and Trusts due to a conflict of interest under 20 Pa.C.S.A. § 3182(1) [3] because she has failed to perform a "duty imposed by law," i.e., her fiduciary "duty of loyalty" to the other three sibling beneficiaries.

2. Whether [Morgan] is subject to removal as Co–Executrix and Trustee due to a conflict of interest under the "for any other reason" provision of 20 Pa.C.S.A. § 3182(5) because she is serving in the simultaneous and dual roles of Executrix and Trustee in both parents' estates and trusts, with pending litigation involving both parents' estates and trusts in Pennsylvania and Florida probate courts.

3. Whether the Orphan's Court committed an error of law or an abuse of discretion for not summarily removing [Morgan] as Co–Executrix of [Mumma, Sr.'s] estate under 20 Pa. C.S.A. § 3183 [4] insofar as removal was "necessary to protect the rights of the parties in interest"—same being the rights of the other three sibling beneficiaries.

---

3. **§ 3182. Grounds for removal**
   The court shall have exclusive power to remove a personal representative when he:
   (1) is wasting or mismanaging the estate, is or is likely to become insolvent, or has failed to perform any duty imposed by law; or
   (5) when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office.
   20 Pa.C.S.A. § 3182.

4. **§ 3183. Procedure for and effect of removal**
   The court on its own motion may, and on the petition of any party in interest alleging adequate grounds for removal shall, order the personal representative to appear and show cause why he should not be removed, or, when necessary to protect the rights of creditors or parties in interest, may summarily remove him. Upon removal, the court may direct the grant of new letters testamentary or of administration by the register to the person entitled and may, by summary attachment of the person or other appropriate orders, provide for the security and delivery of the assets of. the estate, together with all books, accounts and papers relating thereto. Any personal representative summarily removed under the provisions of this section may apply, by petition, to have the decree of removal vacated and to be reinstated, and, if the court shall vacate the decree of removal and reinstate him, it shall thereupon make any orders which may be appropriate to accomplish the reinstatement.
   20 Pa.C.S.A. § 3183.

4. Whether the Orphans' Court committed an error of law or an abuse of discretion for not removing [Morgan] as Trustee of [Mumma, Sr.'s] trusts under 20 Pa.C.S.A. § 7766(1)[5] insofar as removal "best serves the interests of the beneficiaries of the trust" because she committed a serious breach of trust by adamantly refusing to make any distributions of [Mumma's] trusts as provided in Items Seventh and Eighth of [Mumma, Sr.'s] will.

5. Whether the Orphans' Court committed an error of law or an abuse of discretion for not removing [Morgan] as Trustee of [Mumma, Sr.'s] trusts under 20 Pa.C.S.A. § 7766(4) insofar as removal "best serves the interests of the beneficiaries of the trust" due to the substantial change of circumstances and dual capacities as Executrix and Trustee of both parents' estates and trusts with pending litigation in both Pennsylvania and Florida probate courts.

6. Under Pennsylvania decisional law, whether sufficient cause for removal exists because the Executrix's personal interests are in conflict with the interests of [Mumma, Sr.'s] estate as well as the other three sibling beneficiaries of the Estate and Trusts.

Mumma II's Brief at 4–5.

■ While listed as six distinct issues, Mumma II essentially presents a single issue for our consideration, namely whether Morgan's dual roles in connection with the estates of Mumma, Sr. and Mrs. Mumma constitute a conflict of interest requiring her disqualification and removal. If such a conflict of interest exists, some or all of the statutory provisions cited by Mumma II (including 20 Pa.C.S.A. §§ 3182(1), 3182(5), 3183, 7766(1), and 7766(4)), as well as Pennsylvania decisional law would require Morgan's disqualification and removal. The removal of an executrix is a matter vested in the sound discretion of the trial court, and thus we will disturb such a determination only upon a finding of an abuse of that discretion. *Matter of Estate of Frey*, 693 A.2d 1349, 1352 (Pa.Super.), *appeal denied*, 549 Pa. 717, 701 A.2d 578 (1997).

■ Section 3182 of Pennsylvania's Probate, Estates and Fiduciaries Code provides that Orphans' Courts have the "exclusive power to remove a personal representative" when he/she "mismanage[s] the estate ... or has failed to perform any duty imposed by law" or "when, for any other reasons, the interests of the estate are likely to be jeopardized by his continuance in office." 20 Pa.C.S.A. § 3182(1), (5). Our Supreme Court has recognized, however, that "the removal of a trustee is a drastic remedy, and the need for such action must be clear." *In re White*, 506 Pa. 218, 223, 484 A.2d 763, 765 (1984). As stated in *White*, consideration of removal under section 3182 "must be viewed in conjunction with the settlor's expressed confidence in the trustee, evinced by the trustee's appointment" and "where a set-

5. § 7766. Removal of trustee–UTC 706

\* \* \*

(b) When court may remove trustee.-The court may remove a trustee if it finds that removal of the trustee best serves the interests of the beneficiaries of the trust and is not inconsistent with a material purpose of the trust, a suitable cotrustee or successor trustee is available and:

(1) the trustee has committed a serious breach of trust;

\* \* \*

(4) there has been a substantial change of circumstances. A corporate reorganization of an institutional trustee, including a plan of merger or consolidation, is not itself a substantial change of circumstances.
20 Pa.C.S.A. § 7766(b).

tlor appoints a particular trustee, removal should only occur when required to protect the trust property." *Id.* Finally, ordinarily removal cannot occur unless some fiduciary duty has been violated, and the "mere displeasure of a beneficiary" is not a sufficient reason for removal. *Id.*

■ In this case, Mumma, Sr. and Mrs. Mumma both selected Morgan to serve as executrix/trustee of their estates and trusts. A testator's selection of a particular person to serve as their personal representative "represents an expression of trust and confidence," and removal of a personally chosen individual is thus considered to be a "drastic remedy" that requires clear and convincing evidence of a substantial reason for removal. *In re Estate of Pitone,* 489 Pa. 60, 68, 413 A.2d 1012, 1016 (1980); *In re Estate of Lux,* 480 Pa. 256, 269–71, 389 A.2d 1053, 1059–60 (1978); *White,* 506 Pa. at 223, 484 A.2d at 765.

■ Mumma II essentially contends that Morgan has violated fiduciary duties and endangered the assets of Mumma, Sr.'s estate and trusts in two ways.[6] First, Mumma II contends that the trust documents provide that upon the death of Mrs. Mumma, the principal of the trusts is to be divided equally and distributed to the four siblings, but that Morgan has refused to make any such distribution. Mumma II's Brief at 21. Second, Mumma II claims that rather than distributing his father's estate and trust assets to the four siblings, Morgan has transferred them to the estate of Mrs. Mumma, including to a trust established by Mrs. Mumma during her lifetime. *Id.* at 26 ("However, instead of share and share alike amongst the four sibling beneficiaries, their interest in the assets have been transferred to the Florida Estate and Trust where only one sibling, [Morgan], is named as beneficiary.").

■ The trial court determined, however, and based upon our review of the record on appeal we agree, that insufficient evidence exists to support either of these accusations. With respect to the distribution of assets to the four sibling beneficiaries, the trial court determined that Morgan's testimony established that she is completing the process of obtaining valuations of the estate and trust assets and has asked the beneficiaries if they have any preferences regarding the receipt of particular assets or cash, and that she intends to make an equitable distribution of the assets to the beneficiaries after collecting this information. We agree with the trial court that this approach does not constitute any breach of fiduciary duty. Mumma, Sr. specifically provided Morgan, in her role as his personal representative when making an equal distribution among the four sibling beneficiaries, with the power to decide *how* to "make distribution of any trust herein created, either in money or in kind, or partly in money and partly in kind." Item Ninth (10), quoted *supra.* Mumma, Sr. further indicated that the "judgment of the trustees as to what shall constitute an equitable distribution or apportionment shall be binding and conclusive upon the beneficiaries hereof." *Id.*

With respect to the accusation that Morgan has transferred assets from her father's estate and trusts into the estate and trust of Mrs. Mumma (for the purpose of misappropriating them for herself as primary beneficiary thereof), the trial court

---

6. Mumma II also mentions pending litigation between himself and the estate as a basis for a conflict of interest. Mumma II's Brief at 25. He fails, however, to mention any specific litigation or otherwise develop an argument on this basis for Morgan's removal. Accordingly, this argument is waived for purposes of appeal. *Commonwealth v. Spotz,* 610 Pa. 17, 80 n. 21, 18 A.3d 244, 281 n. 21 (2011).

concluded, and we agree, that no substantial evidence of record supports this contention. Mumma, Sr. directed that Mrs. Mumma was entitled to request and receive an annual distribution of the income of the two trusts, and up to $5,000 (or up to 5% of the then principal) from the principal of his marital trust. At the evidentiary hearing, Morgan testified that these distributions ceased at the time of her mother's death, and that if there were any discrepancies in the amounts that had been transferred to Mrs. Mumma during her lifetime, appropriate adjustments and correcting transfers could be made. In testimony that the trial court clearly found credible, Morgan testified that Mumma II's accusations were simply not true, as since the time of her death there have been no transfers of principal from Mumma, Sr.'s estate and trusts to Mrs. Mumma's estate and trust.

As discussed hereinabove, our Supreme Court has made clear that the drastic remedy of removal of an appointed personal representative generally requires actual proof of a breach of a fiduciary duty. *White*, 506 Pa. at 223, 484 A.2d at 765. The trial court found, based upon the evidence presented at the hearing on January 28, 2011, that Mumma II failed to present sufficient evidence to support his accusations of wrongdoing by his sister. Mumma II's displeasure with Morgan's performance, without more, does not suffice to necessitate the removal of the individual specifically chosen by both father and mother to serve as executrix of their estates and trustee of their trusts. Accordingly, no relief is due.

Alternatively, Mumma II argues that Morgan's dual roles in connection with the estates and trusts of Mumma, Sr. and Mrs. Mumma constitute an inherent conflict of interest requiring her removal without the need for proof of bad faith or fraudulent intent. Mumma II's Brief at 26. Mumma II cites several appellate court decisions that support this general principle, including *In re Rafferty's Estate*, 377 Pa. 304, 105 A.2d 147 (1954); *In re: Estate of Gadiparthi*, 158 Pa.Cmwlth. 537, 632 A.2d 942 (1993); and *In re Estate of Westin*, 874 A.2d 139 (Pa.Super.2005).[7] These cases present a *prima facie* conflict with cases cited hereinabove, including for example *White*, in that they hold that a personal representative may be removed in the absence of any proof of actual wrongdoing. To the contrary, in these cases, our courts have held that the conflict of interest itself justifies the removal, without the need for proof of wrongdoing by the personal representative. *See, e.g., In re Dobson's Estate*, 490 Pa. 476, 483 n. 6, 417 A.2d 138, 142 n. 6 (1980).

■ Careful review of these cases, however, reveals that they have no application in this case, as they all involve intractable conflicts of interests between the represen-

---

7. Mumma II cites an additional decision of our Supreme Court, *In re Dobson's Estate*, 490 Pa. 476, 417 A.2d 138 (1980). In *Dobson's Estate*, an executor sold estate property without any independent appraisal or other valuation process (and without prior court approval) to a corporation in which his wife was an officer, director, and significant shareholder. The issue addressed in *Dobson's Estate*, however, was whether or not the executor should have been assessed a surcharge for his negligence in connection with his treatment of the tax consequences of the sale. *Id.* at 484, 417 A.2d at 142. The Supreme Court's decision expressed no opinion regarding whether or not the executor should have been removed from his position as a result of a conflict of interest. *Id.* ("Therefore, because the executor erred in calculating the value of decedent's shares and thereby obtained a price below the value of the shares, we must reverse the decree of the court *en banc*, vacate the decree of the auditing judge and remand for determination of the proper surcharge to be imposed on the executor.").

tatives' personal financial interests and those of the estate and its beneficiaries. In *Rafferty's Estate,* the administrator of his father's estate claimed that potential assets of the estate (including the proceeds from a retirement disability fund) belonged not to the estate (and its five sibling beneficiaries), but rather to himself personally. *Rafferty's Estate,* 377 Pa. at 304–06, 105 A.2d at 148. Similarly in *Gadiparthi,* a husband administrator of his wife's estate challenged her ownership of property titled in her name, claiming that she owned the property as his agent. *Gadiparthi,* 632 A.2d at 944. And in *Westin,* the executor's law firm had embezzled more than $370,000 in estate funds, thus putting the executor in the position of representing the estate in a lawsuit against himself (and his law partners) for recovery of the estate funds. *Westin,* 874 A.2d at 143.

The present case does not present a similar conflict of interest, namely one in which Morgan's personal financial interests directly conflict with the interests of her father's estates and trusts. While Morgan is the executrix and trustee in connection with both her father's and mother's estates and trusts and is also a beneficiary of both, this does not, of itself and without another more specific conflict, present the sort of intractable conflict of interest that would necessarily prevent her from carrying out her fiduciary duties in all of her various roles. Based upon the record on appeal, she has performed all of the required functions as executrix and trustee of Mumma, Sr.'s estate and trusts, including the filing of appropriate interim and final accountings. Mumma II's objections in those matters have been referred to a court-appointed auditor for resolution. Moreover, as discussed hereinabove, we agree with the trial court's conclusion that Morgan has not engaged in any obvious wrongdoing or improper transfers of assets (including indirectly to her mother's estate and/or trust).

For these reasons, we will not disturb the trial court's decision to deny Mumma II's Motion for Disqualification.

Order affirmed.

STRASSBURGER, J. files a Concurring Opinion.

## CONCURRING OPINION BY STRASSBURGER, J.:

I join the Majority opinion. I agree with the Majority's conclusion that the trial court properly denied Mumma II's Motion for Disqualification and Removal of the executrix. I also agree that, pursuant to *Matter of Estate of Velott,* 365 Pa.Super. 313, 529 A.2d 525, 527 (1987), this Court is constrained to consider this order a collateral order subject to immediate appeal.

However, I feel compelled to express my disagreement with the case law on the issue that an order denying the removal of an executor is a collateral order subject to immediate review.[1] In this case, Mumma

---

1. "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). This Court has offered the following analysis as to why the elements for a collateral order are met for an order denying the removal of an executor:

First, it is an order which finally determines a claimed right; i.e. the right of a beneficiary or beneficiaries to a competent and trustworthy executor who will carefully and faithfully carry out the intentions of the testator and also use its best efforts to maximize and fairly distribute the estate to the devisees and legatees. By denying the petition the lower court has made a determination that this right has not been infringed, just as an order granting the petition would,

II concedes that this petition is the fourth time since 1989 he has asked the trial court to remove Morgan as executrix. Furthermore, a court-appointed auditor has conducted over 33 days of hearings on the accounting of this estate. Allowing this order to be appealable wastes judicial resources and promotes the type of piecemeal litigation recently frowned upon by our Supreme Court. *See Vaccone v. Syken*, 587 Pa. 380, 899 A.2d 1103, 1107 (2006) ("[W]e believe that it has become necessary to remember the purpose of the finality rule, which is to avoid piecemeal litigation, and not to become swallowed up in its exceptions."). After all, "[i]t is more important to prevent the chaos inherent in bifurcated, trifurcated, and multifurcated appeals than it is to correct each mistake of a trial court the moment it occurs." *Calabrese v. Collier Twp. Mun. Auth.*, 432 Pa. 360, 248 A.2d 236, 238 (1968) (O'Brien, J. dissenting).

In my view, the development of the case law in this area betrays a serious lack of trust in our trial bench.

of course, indicate an opposite conclusion. Such a determination is not the end of the litigation since it is part of the administration, accounting and distribution of the decedent's estate. It is, however, a separate and collateral order in that the executor, while performing an important administrative and fiduciary function, can be replaced by another party. The administration of the estate, while delayed, would continue.

Second, the right is one which is too important to be denied review. Neither party contends anything to the contrary. When the assets of an estate are subject to possible harm or diminution because of acts or omissions of an executor the courts are the appropriate forum to decide what action is necessary to remedy that harm. While the trial courts, because of the experience acquired in handling estate cases, are eminently capable of deciding questions of removal, such questions involve serious issues bearing upon the property in question, the reputation of the executor and also the interest of the state in assuring orderly administration and in properly ascertaining and collecting revenues. We find these issues important enough to merit appellate review.

Third, in many, if not all, cases the right will be irreparably lost if review is deferred. [Where the executor is an individual,] deferral of review may mean that the assets of the estate will be dissipated or destroyed in the interim. Thus, the right would be lost because surcharge would be nothing more than a hollow remedy.

*In re Georgiana's Estate*, 312 Pa.Super. 339, 458 A.2d 989, 991 (1983), affirmed 504 Pa. 510, 475 A.2d 744 (1984) (per curiam).