J-A14019-15, J-A14020-15, J-A14021-15

2015 PA Super 209

| IN RE: ESTATE OF ROBERT M. MUMMA, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF BARBARA M. MUMMA | |
| | No. 905 MDA 2014 |

Appeal from the Order Entered April 30, 2014
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 21-86-398

| IN RE: ESTATE OF ROBERT M. MUMMA, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF ROBERT M. MUMMA, II | |
| | No. 921 MDA 2014 |

Appeal from the Order Entered April 30, 2014
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 21-86-398

1

J-A14019-15, J-A14020-15, J-A14021-15

| IN RE: ESTATE OF ROBERT M. MUMMA, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF BARBARA M. MUMMA | No. 1322 MDA 2014 |

Appeal from the Order Entered July 7, 2014
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 21-86-398

BEFORE: BENDER, P.J.E., JENKINS, J., and STRASSBURGER, J.[*]

OPINION BY JENKINS, J.:                    **FILED OCTOBER 02, 2015**

Robert Mumma, Sr., a successful businessman, died in 1986, leaving a widow, Barbara McK. Mumma ("Widow"), and four children, Barbara, Robert II, Linda and Lisa. Between 1986 and 2010, Widow and Lisa served as co-executrices of Robert Sr.'s estate ("the Estate") and co-trustees of two trusts created by his will (the "Marital Trust" and "Residual Trust"). Widow died in 2010, leaving Lisa as the sole personal representative and trustee.

This is the most recent chapter in almost thirty years of litigation involving the Estate. At 905 MDA 2014 and 921 MDA 2014, Barbara and Robert II, respectively, have filed timely appeals from the Orphans' Court's

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

order entered April 30, 2014 denying their exceptions to the Final Auditor's Report and confirming all accounts to which Barbara and Robert Jr. filed exceptions. At 1322 MDA 2014, Barbara timely appeals an order entered July 7, 2014 which (1) authorizes Lisa to vote shares of Bobali[1] Corporation stock owned by the Residual Trust, and (2) denies Barbara's motion seeking either an alternate resolution of the authority-to-vote issue or an order directing distribution of Bobali stock to the remaindermen in kind. The appellants and the Orphans' Court complied with Pa.R.A.P. 1925 in each appeal. Pursuant to Pa.R.A.P. 513, we have consolidated these appeals for purposes of disposition. We affirm.

## Proceedings Relating To Robert Sr.'s Estate And Trusts

During his lifetime, Robert Sr. owned multiple companies, real estate, and a horse racing and breeding business. He died in 1986, leaving Widow and Lisa as co-executrices of the Estate and co-trustees of the Marital Trust and Residual Trust. The income of both Trusts was to be paid to Widow, who also had the right annually to take for herself up to five percent of the principal of the Marital Trust. The remaindermen of the Trusts were the four children: Barbara, Robert II, Linda and Lisa. Widow was 62 at the time of Robert Sr.'s death, and Lisa was 26. Robert Sr. left a note attached to his will advising Widow to "[m]ove slowly and get good counsel. Then do what

---

[1] Bobali is a Pennsylvania corporation whose name amalgamates the names of the Mumma children.

you honestly think best." Heeding this advice, Widow and Lisa hired George Hadley, a Buffalo, New York accountant who had performed accounting services for Robert Sr. personally and for Mumma family businesses and other family members since the early 1960s. Widow and Lisa also hired Arthur Klein, an attorney at Morgan, Lewis & Bockius in Philadelphia, to assist in Estate and Trust matters.

At first, Robert II disclaimed his interest in the Trusts, but he later changed his mind and convinced the Orphans' Court to reinstate his interests.

At the time of Robert Sr.'s death, several Mumma family businesses were in debt, and there were relatively few liquid assets. Widow took full-time control of one of the family companies, Pennsylvania Supply Company ("Pennsy Supply"), and Lisa suspended her own law practice to look after the family businesses. Widow and Lisa entered into negotiations to sell the family's operating businesses, including Pennsy Supply, to CRH, plc. Robert II held up the sale by claiming a right of first refusal, but in 1992, the Court of Common Pleas of Cumberland County held that he did not have a right of first refusal. Negotiations resumed, and despite several more lawsuits by Robert II, the sale consummated in 1993.

On many other occasions, Robert II filed lawsuits raising a variety of grievances against the Estate. Over the years, he filed four petitions to remove Lisa as executrix of Robert Sr.'s Estate and trustee of the Marital

and Residual Trusts. ***In Re Estate of Mumma***, 41 A.3d 41, 43 (Pa.Super.2012). None were successful. ***Id***. In addition,

> [Robert II] filed multiple lawsuits (both in Cumberland County and in Florida) seeking to obtain ownership of various assets. Since the late 1980s, he … also filed numerous motions, applications, and petitions in the trial court in opposition to [Lisa's] efforts to resolve estate issues. To this end, he … frequently appealed the orders of the trial court to this Court. *See, e.g.,* Notices of Appeal filed September 15, 2005 (1546 MDA 2005) and January 14, 2009 (270 MDA 2009)—both of which were subsequently quashed by Orders of this Court.

***Id***. at 43 n. 2.

Widow and Lisa filed four accounts (the last being a Final Account) concerning the Estate and five each for the Marital and Residual Trusts covering the period from Robert, Sr.'s death in 1986 until Widow's death in 2010. Barbara and Robert II filed objections to all of these accounts, and the Orphans' Court referred all objections to an auditor, Joseph D. Buckley ("the Auditor"). The Auditor conducted more than forty days of hearings regarding the objections. Nineteen fact witnesses testified; two other fact witnesses testified via deposition; and six experts testified. The hearings yielded more than 8200 pages of transcripts and more than 470 exhibits.

On August 7, 2013, the Auditor produced a 128-page report ("Auditor's Report") recommending that the Orphans' Court accept all accounts as filed and overrule all of Barbara's and Robert II's objections. The Auditor noted in his report that the Estate has already spent $5 million in attorney fees.

On April 30, 2014, the Orphans' Court denied all exceptions of Barbara and Robert II and confirmed all accounts to which they had filed exceptions.

### Proceedings Relating to Bobali Corporation

In 2010, Lisa filed an action in the Court of Common Pleas of Dauphin County seeking appointment of a custodian or receiver to preserve the assets of Bobali Corporation. On December 31, 2013, the Dauphin County court held that Bobali Corporation consisted of the following shareholders:

| | |
|---|---|
| Lisa: | 2.1489 shares |
| Robert II: | 2.1489 shares |
| Barbara: | 2.1489 shares |
| Linda: | 1.07445 shares |
| Widow's estate: | 1.07445 shares |
| Residual Trust: | 1.4044 shares |

The Dauphin County court ordered that the Orphans' Court of Cumberland County should decide who has the right to vote the Residual Trust's 1.4044 shares. Lisa filed a motion in Orphans' Court seeking a declaration that she has the right to vote all 1.4044 shares. Barbara filed a motion in Orphans' Court demanding in-kind distribution of the 1.4044 shares to the four children.

At the same time, the Dauphin County court ordered Bobali Corporation to hold a shareholders' meeting. The meeting took place on January 24, 2014; in attendance were (1) Barbara, (2) Robert II, and (3) counsel holding a proxy for Lisa individually, as trustee for the Residual Trust, and as executrix of Widow's estate. Linda did not attend. Barbara claimed during the meeting that she had an interest in ¼ of the Residual

Trust's stock (.3511 shares), and that Lisa only owned ¼ of the Residual Trust's stock as well. Nevertheless, Lisa's counsel voted all 1.4044 shares held by the Residual Trust in favor of Lisa's preferred candidates to act as directors of the corporation. Based on the vote, the three elected directors of Bobali Corporation were Robert II, Lisa and George Faller (Lisa's choice). According to Barbara, if Lisa were only able to vote .3511 shares, Barbara would have become the third director instead of George Faller.

On July 7, 2014, following an evidentiary hearing, the Orphans' Court held that Lisa had the authority to vote all 1.4044 shares of stock and denied Barbara's motion seeking either an alternate resolution of the authority-to-vote issue or an order directing distribution of the Bobali stock to the remaindermen in kind.

## Issues Raised On Appeal

Barbara raises the following issues in her appeal at 905 MDA 2014:

1. Whether the Orphans Court erred in misinterpreting the terms of the Will and the trusts in a manner which violated the intent of the testator with respect to the distribution of assets to the beneficiaries of the Trusts, by authorizing actions by the Trustee involving corporations not party to the probate proceedings and an intended liquidation of real property assets held by various corporations and by tenancies-in-common, and by dismissing the language of the Will as "precatory," relying instead on the general language of broad powers given to the trustees as taking precedence over the specific expression of the testator's intent as to the distribution of assets of the Trusts[?]

2. Whether the Orphans' Court erroneously misinterpreted the Will and the Trusts and endorsed the unequal treatment of the four beneficiaries in a manner which is not impartial and which unfairly worked to the benefit of the beneficiary serving as

- 7 -

Trustee by dismissing objections relating to the funding of the trusts, to the expenses incurred by the Residuary Trust and to the allocation of expenses between the Residuary Trust and the Marital Trust[?]

Brief Of Appellant, 905 MDA 2014, at 4.

Robert II states the following issues in the "Questions Presented" section of his brief at 921 MDA 2014:

1. Did the trial court err or abuse its discretion by holding argument in this matter when Beneficiary [Robert II] was recovering from surgery and could not attend. Despite requests for a transcript, the trial court refused to have a record of the proceeding, depriving [Robert II] of any knowledge of the positions taken or issues argued[?]

2. Did the trial Court err in issuing orders authorizing the Trustee to proceed with liquidation of any Trust assets other than by complete distribution as provided by the specific terms of the Trusts at Seventh and Eighth of the Will[?]

3. Did the trial court lack jurisdiction over assets owned by non-party corporations and tenancies in common organized outside and apart from the Estate[?]

4. Did the trial court abuse its discretion in not vacating an order from July 30, 2012 where Appellant failed to create a record in support of his request[?]

5. Did the trial court err in holding an argument court when it was not presented a plan of distribution of Estate assets[?]

6. Did the trial court err in confirming any accounts when the plan of distribution of estate assets into those accounts was never confirmed[?]

7. Did the trial court err in not determining by jury trial the disputed ownership of assets carried on the estate inventory[?]

Brief For Appellant, 921 MDA 2014, at 4-5. In the body of his brief, Robert II raises two other issues: (1) Article Thirteenth of Robert Sr.'s will

- 8 -

precluded sales of family businesses to non-family members; and (2) the Orphans' Court erred in awarding attorney fees and costs against Robert II based on his conduct before the Auditor.

Barbara raises the following issues in her appeal at 1322 MDA 2014:

1. Whether the Trial Court erred in entering the Order because the Order misinterprets the Will and violates the clear intent of the testator with respect to the distribution of assets to the beneficiaries of the trusts, both generally and as to the shares of stock in Bobali Corporation currently held in the Residuary Trust[?]

2. Whether the Trial Court erred in failing to consider established legal authority in concluding that the Residuary Trust was anything more than the nominal holder of the shares of Bobali Corporation stock currently held by the Residuary Trust and for failing to recognize the proposition that where the Residuary Trust is the mere nominal holder of the Bobali Corporation shares, the Trustee must vote those shares in a manner which is not contrary to the express direction of the beneficiaries and equitable owners of the shares other than the Trustee herself, thereby perpetuating control of Bobali Corporation in herself long beyond what the testator intended to be the life of the Trust[?]

Brief For Appellant, 1322 MDA 2014, at 4.

## Jurisdiction

We have jurisdiction over these appeals pursuant to Pa.R.A.P. 342, which provides:

**(a)** **General rule.** An appeal may be taken as of right from the following orders of the Orphans' Court Division:

(1) *An order confirming an account*, or authorizing or directing a distribution from an estate or trust;
…

(3) *An order interpreting a will* or a document that forms the basis of a claim against an estate or trust;

**(b) Definitions.** As used in this rule:

(1) 'estate' includes the estate of a decedent, minor, incapacitated person, or principal under Chapters 33, 35, 51, 55 and 56 of Title 20 of the Pennsylvania Consolidated Statutes ('Probate, Estates and Fiduciaries Code') ('PEF Code');

(2) 'trust' includes inter vivos and testamentary trusts and the "custodial property" under Chapters 53 and 77 of the PEF Code;…

**(c) Waiver of objections.** Failure to appeal an order that is immediately appealable under paragraphs (a)(1)-(7) of this rule shall constitute a waiver of all objections to such order and such objections may not be raised in any subsequent appeal.

*Id*. (emphasis added). Rule 342(a) permits an aggrieved party to take an immediate appeal of all categories of orders therein without any need to obtain a declaration from the court that the order is "final" in nature. Rule 342(c) cautions that a party who fails to appeal an order that falls within the categories enumerated in Rule 342(a) is barred from appealing the order later on.

Pursuant to Pa.R.A.P. 342(a)(3), we have jurisdiction over all three appeals because they arise from "order[s] interpreting [Robert Sr.'s] will." *Id*. In addition, pursuant to Pa.R.A.P. 342(a)(1), we have jurisdiction over the two appeals from the April 30, 2014 order (905 and 921 MDA 2014), because they arise from "an order confirming an account". *Id*.

- 10 -

Robert II suggests that his own appeal at 921 MDA 2014 should be quashed because the Orphans' Court's order was interlocutory and non-appealable. We disagree, because as stated above, the appeal is proper under Rule 342(a)(1) and (a)(3).

**Barbara's Appeal At 905 MDA 2014**

Barbara's first argument focuses on three provisions in Robert Sr.'s will. Article Seventh of the will directs that upon Widow's death, the assets in the Marital Trust, "as it is then constituted," shall be paid to the four children, "share and share alike". Article Eighth provides the same directive for the Residual Trust. Lastly, Article Thirteenth states Robert Sr.'s "*desire*" that "*if expedient and possible*, the businesses which I have personally directed during my lifetime and of which I have an interest be continued under the management and control of my immediate family." [Emphasis added].

Barbara argues that these provisions require each child to receive an equal share of each Trust in precisely the state that the principal existed at the termination of the Trust, i.e., equal distribution "in kind" instead of equal distribution of the monetary value of the principal. Barbara claims that Robert Sr. intended this construction of the will to guarantee the family's continued ownership of family businesses. As an example, Barbara insists that Lisa make in kind distributions of stock in a tenancy in common called MRA-1 and several corporations (D-E Distribution Corporation, G-A-T

Distribution Corporation and Bobali Corporation) instead of monetary distributions. According to Barbara, Lisa refuses to make distributions in kind so that she can maintain control over majority interests of shares and treat these entities as her "private preserve". Barbara's Brief, at 13-19.

Lisa requested, and the Auditor recommended, that the Trusts liquidate "some" assets of the terminated trusts for distribution purposes. The Orphans' Court accepted the Auditor's recommendation (although neither the Orphans' Court's opinion nor the briefs identify which assets would be liquidated).

An auditor's findings of fact are entitled to great weight because of his ample opportunity to observe the witnesses' intelligence and credibility. **Dingee v. Wood**, 77 A. 440 (Pa.1910). Moreover, we review the Orphans' Court's findings for abuse of discretion. **In re Scheidmantel**, 868 A.2d 464, 478-79 (Pa.Super.2005). This Court will reverse the Orphans' Court's legal conclusions if the "rules of law on which the court relied are palpably wrong or clearly inapplicable." **In Re Estate of Pendergrass**, 26 A.3d 1151, 1152 (Pa.Super.2011).

The Orphans' Court acted within its discretion by rejecting Barbara's argument. We agree with the Orphans' Court's determination that Robert, Sr.'s "desire" that businesses remain in the family was mere precatory (non-binding) language – a wish instead of a mandate.

> When precatory words are used merely for the purpose of advising or influencing, or expressive of a wish or desire that the

legatee make a certain use of the testator's bounty, they are not obligatory upon that to whom they are addressed; but when used to express his manifest intention to control or direct, they are mandatory, and will be so construed in saying what effect is to be given to them...

*In re: Estate of Corbett*, 241 A.2d 524, 525 (Pa.1968) (citing *Stinson's Estate* **(No. 1)**, 81 A. 207, 208 (Pa.1911)). "The test is, whether the precatory expression was used in a mandatory sense, though couched in a mild, polite, courteous command, or only as suggestion or wish, falling short of binding and compulsory direction..." *In re: Estate of Pearson*, 275 A.2d 336, 339 (Pa.1971). The Orphans' Court correctly reasoned that the precatory language in Robert Sr.'s will "was itself contingent – upon expedience and possibility – neither of which, given the dysfunctional nature of the relationship that has developed among the remaindermen, has materialized as the testator had hoped." Orphans' Court Opinion And Order Sur Objections To Final Auditor's Report, 4/30/14 ("Opinion I"), at 14.

Moreover, the Orphans' Court correctly concluded that the will expressly gave the trustee discretion to distribute trust assets through means other than "in kind". Opinion I, at 14. The will gives the trustee authority "to receive or make distribution of any trust herein created, either in money or in kind, or partly in money and partly in kind. The judgment of the trustees as to what shall constitute an equitable distribution or apportionment shall be binding and conclusive upon the beneficiaries hereof

- 13 -

…" Will, ¶ 9(10). This provision allows for monetary distributions as well as in kind distributions.

Finally, both Barbara and Robert II have raised the in-kind argument in prior appeals without success. Thus, Barbara's argument fails under the law of the case doctrine, a series of rules "that embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided *by another judge of that same court* or by a higher court in the earlier phases of the matter." ***Ario v. Reliance Ins. Co.***, 980 A.2d 588, 597 (Pa.2009) (emphasis added). To elaborate, in ***Estate of Mumma***, 41 A.3d 41 (Pa.Super.2012), shortly after Widow's death in 2010, Robert II sought to have Lisa removed as trustee for alleged failure to act in accordance with the will. Robert II "contend[ed] that the trust documents provide that upon [Widow's] death … the principal of the trusts is to be divided equally and distributed to the four siblings, but that [Lisa wrongfully] refused to make any such distribution." ***Id***. at 1250. This Court rejected Robert II's argument in an opinion authored by Judge Donohue:

> With respect to the distribution of assets to the four sibling beneficiaries, the trial court determined that [Lisa's] testimony established that she is completing the process of obtaining valuations of the estate and trust assets and has asked the beneficiaries if they have any preferences regarding the receipt of particular assets or cash, and that she intends to make an equitable distribution of the assets to the beneficiaries after collecting this information. We agree with the trial court that this approach does not constitute any breach of fiduciary duty. [Robert] Sr. specifically provided [Lisa], in her role as his personal representative when making an equal distribution among the four sibling beneficiaries, with the power to decide

> *how* to 'make distribution of any trust herein created, either in money or in kind, or partly in money and partly in kind.' Item Ninth (10), quoted ***supra***. [Robert] Sr. further indicated that the 'judgment of the trustees as to what shall constitute an equitable distribution or apportionment shall be binding and conclusive upon the beneficiaries hereof.' ***Id.***

***Id***. at 50-51 (emphasis in original). Two years after Judge Donohue's opinion, this Court quashed several appeals by Robert II and Barbara from interim orders relating to Estate accounting. ***Estate of Mumma***, Nos. 1003, 1027, 1028 & 1222 MDA 2013 (Pa.Super., 10/24/14) (unpublished memorandum). In the course of this decision, Judge Wecht observed that Lisa's authority with respect to distribution of trust assets "has already been decided by this Court in a prior decision." ***Id***. at 25-26. Judge Wecht then recited the latter half of the foregoing passage from Judge Donohue's opinion, and he concluded: "In authorizing [Lisa] to make distributions in kind, [Robert Sr.] also gave [Lisa] the means to address any indivisible property interests or shares in corporate entities." ***Id***.

Barbara's second argument at 905 MDA 2014 focuses on Widow's annual right to take up to five percent of the principal of the Marital Trust for herself, a right Widow in fact exercised annually. Barbara claims that Widow took far too much money, because (1) Widow and Lisa deliberately misconstrued Article Seventh of the will, the Marital Trust provision; and (2) they conspired to "overfund" the Marital Trust and "underfund" the Residual Trust by allocating excessive assets and insufficient expenses to the Marital Trust. Through these strategems, Barbara asserts, Widow used her "scoop

out" power to make excessive annual withdrawals from the Marital Trust, thus stealing money that should have gone to the children as remaindermen of the Trusts. We address each subargument in turn.

*Construction of Article Seventh of the will*. Article Seventh directs that the Marital Trust shall be funded with

> fifty (50) percent of my total gross estate as finally determined for federal estate tax purposes, taking into account *and including therein*, for computation purposes, my undivided interest in the value of all my interests in property which pass or have passed to my wife under other provisions of this Will or otherwise than under this Will ...

*Id*. [Emphasis added]. Before the Auditor, Barbara's expert contended that "including therein" required *exclusion* from the Marital Estate of amounts passing outside the will; inclusion of these amounts, said the expert, improperly inflated the Marital Trust. Robert II's expert, on the other hand, admitted that "including therein" required addition of amounts passing outside the will to the Marital Trust. Auditor Hearing, 4/21/09, at 154. Lisa also contended that "including therein" required addition of amounts passing outside the will.

The Auditor rejected Barbara's position. He observed that prior to tax law amendments in 1981, wills sometimes provided formulas which reduced the marital deduction bequest by "excluding therefrom the value of all property passing to my wife under other will provisions or outside my will." The Auditor reasoned that Robert Sr. adopted an alternative formula, "including therein," thus demonstrating Robert, Sr.'s intent to include these

interests in the Marital Trust. Auditor Report, at 8-10. The Auditor observed that Widow and Lisa did not arrive cavalierly at their decision to add these amounts to the Marital Trust but only did so after seeking the advice of "numerous professionals," including accountant Hadley. *Id*. at 85.

The Orphans' Court agreed with the Auditor's reasoning. Opinion I, at 19-20. We hold that this decision was within the Orphans' Court's discretion. In the context of Article Seventh, "including therein" plainly requires addition of amounts passing to Widow outside the will to the value of assets passing under the will in order to derive the proper figure against which to apply the fifty percent factor. The theory proposed by Barbara's expert -- "including therein" requires exclusion of amounts passing outside the will -- is at best counterintuitive. A testator probably would not attempt to exclude items through words of inclusion unless he is too feeble-minded to execute a will in the first place.

*Alleged conspiracy between Widow and Lisa to overfund the Marital Trust and underfund the Residual Trust*. Barbara insists that the Marital Trust was *over*funded through inclusion of many *under*valued assets that should have received higher valuations and then been included in the Residual Trust. In particular, Barbara argues that Pennsy Supply Company, a Marital Trust asset until its sale in 1993, was "grossly undervalued" at $3.5 million when it actually was worth $35 million. Brief For Appellant, 905 MDA 2014, at 25-28.

The Orphans' Court acted within its discretion by accepting the Auditor's recommendation to reject Barbara's accusation against Lisa. We agree with the Orphans' Court that Barbara's claim is implausible, for it rests on the premise that Lisa plotted with Widow to defraud *herself* out of her remainderman share by intentionally undervaluing assets and then including them in the Marital Trust. Opinion I, p. 18 ("[Lisa] could have had as much to lose as the other remaindermen from the putative overfunding").

Moreover, the Orphans' Court properly determined that there was no improper valuation or allocation of Trust assets. Opinion I, at 17-18. In the words of the Orphans' Court, the valuation issues were largely "battles of the experts". Opinion I, at 17. The finder of fact is not bound by the testimony of a particular expert witness and is under no obligation to accept the expert's conclusions. *George v. Ellis*, 820 A.2d 815, 817 (Pa.Super.2003). The Auditor carefully weighed the testimony of each party's expert and determined that Hadley, the accountant for Widow and Lisa, was the most credible expert. Opinion I, at 17-20. It was well within the Orphans' Court's discretion to accept the Auditor's decision to credit Hadley instead of Barbara's expert. The Auditor determined, and the record reflects, that (1) Hadley is an experienced accountant who performed considerable accounting work for Robert Sr. and Mumma family interests long before Robert Sr.'s death; (2) Hadley performed one valuation of family assets for tax purposes as of the date of Robert Sr.'s death in 1986 and another valuation at the end

of 1987 for the purpose of funding the Marital Trust; (3) in accordance with IRS regulations, Hadley adjusted the value of Mumma businesses upward from the date of Robert Sr.'s death to the date of the Marital Trust; (4) the IRS and Robert Sr.'s Estate ultimately agreed upon the upward adjustments; and (5) these valuations were reasonable, given Hadley's use of proper methodology and his knowledge of and experience with Robert Sr.'s and the Mumma family's assets. Auditor Hearings, 8/6/09, at 2330-31; 12/15/09, at 3719-30, 3751-58; 12/17/09, at 4096-4105.

The record provides substantial support for Hadley's appraisal of Pennsy Supply, the entity which Barbara claims Hadley undervalued. Barbara contends that in 1987, Touche-Ross valued Pennsy Supply's worth as between $10-$12 million, thus demonstrating that Hadley's valuation of Pennsy Supply later that year ($3.5 million) was "grossly" improper. To begin with, the actual difference between Hadley's and Touche-Ross' valuations was smaller than Barbara claims. Hadley valued Pennsy Supply at $6.9 million, while Touche-Ross valued Pennsy Supply at $10.2 million. Auditor Hearing, 10/29/09, ex. T-59, at 2. Further, Hadley detected multiple problems in Touche-Ross' appraisal, including Touche-Ross' use of inappropriate comparables, failure to visit corporate premises and operations, and use of income projections that failed to account for the historically cyclical nature of Pennsy Supply's business. Auditor Hearing, 12/15/09, at 3740-47. Barbara's expert, Joseph Wilson, conceded a number

of shortcomings in Touche-Ross' appraisal and/or strengths in Hadley's appraisal. Wilson agreed that the "comparables" used in a portion of its analysis — large, publicly-traded entities — were not appropriate to Pennsy Supply, and that discounts for lack of marketability (such as those applied by Mr. Hadley) are appropriate for minority interests in closely-held businesses. Auditor Hearing, 10/26/09, at 2552, 2570-71. In addition, Hadley's valuation of Pennsy Supply was consistent with the value that Robert II placed on the company during discussions regarding his potential purchase of the company. In early 1987, after reviewing current financial information that he requested, Robert II expressed his "feeling that Pennsy Supply was worth $5 million, that Pennsy Supply with the aggregates was worth $7 million." Auditor Hearings, 12/17/09, at 4125-27, 6/14/10, at 6751-53.

In support of her argument about Pennsy Supply, Barbara points to a 1988 offer by CRH plc, a building material company, to purchase Pennsy Supply for $52 million, a higher figure than the figure Hadley used for Pennsy Supply while funding the Marital Trust in 1987. Auditor Hearing, 12/15/09, at 4133-35. The Orphans' Court had the discretion to find this fact unpersuasive, because CRH withdrew its offer in 1989. Although CRH ultimately purchased Pennsy Supply and other entities in 1993, it was at the much lower price of $34 million (with $2 million contingent upon whether

CRH exercised an option to purchase 50% of Lebanon Rock, Inc.). Auditor Hearing, 6/14/10, ex. T-102, at 5.

The final part of the conspiracy, Barbara claims, was a plot to charge excessive professional fees to the Residual Trust and insufficient fees to the Marital Trust to improperly inflate the value of the Marital Trust and Widow's annual 5% withdrawals. Barbara also complains that the fees that Robert Sr.'s Estate incurred in Florida litigation against Robert II were disproportionate to the relief obtained, and only one law firm should have worked for Robert Sr.'s Estate instead of the two that Lisa hired.

The Orphans' Court properly rejected Barbara's arguments. The record shows that the allocation of legal fees between the Marital and Residual Trusts was entirely appropriate. Indeed, the Marital Trust actually paid more in legal fees than the Residual Trust and Robert Sr.'s Estate combined. Auditor Hearing, 12/18/09, ex. T-171; Auditor Hearing, 6/21/11, ex. T-1040. While the Residual Trust paid twice as much in accountant fees to Hadley ($356,677.00) as the Marital Trust ($162,905.00), Barbara fails to provide any proof that the fees were misallocated. Merely because the Residual Trust paid more in fees does not demonstrate misallocation of these fees. With regard to the Florida litigation, the Orphans' Court properly reasoned that the Estate had no choice but to hire two firms and pay them substantial fees to defend the Estate against Robert II's misappropriation of Florida-based assets. Opinion I, at 21-22. The Estate suffered no harm

from paying these fees, because under Florida law, the Estate will recover these fees from Robert II with interest. *Id*.

### Robert II's Appeal at 921 MDA 2014

The first issue raised in the "Questions Presented" section of Robert II's brief is that the Orphans' Court abused its discretion by holding argument when he was hospitalized and could not attend, refusing to permit transcription of the argument, and ordering his attorney to present argument despite his attorney's repeated requests for more time to prepare. Robert II failed to present any argument on this claim in his brief. Therefore, it is waived. *Green v. Green*, 69 A.3d 282, 285 n.3 (Pa.Super.2013) (issue not addressed in argument section of appellant's brief was waived for lack of development on appeal).

Second, Robert II echoes Barbara's argument that the Orphans' Court erred by refusing to order in-kind distribution under Articles Seventh and Eighth of the will. We find this argument devoid of merit for the reasons given on pages 11-15 above.

Third, Robert II contends that the Orphans' Court lacked jurisdiction over assets owned by non-party corporations and tenancies in common organized outside and apart from Robert Sr.'s Estate. This argument rests upon two subarguments: (1) the disposition of assets by Walter Mumma — Robert Sr.'s father who died in 1961 — in his will had some binding effect on Robert Sr.'s own actions or those of Widow and Lisa; and (2) a "dispute"

exists as to whether Robert Sr. owned stock of Pennsy Supply Company at his death. The evidence refutes both claims.

With respect to the first subargument, Robert II claims that Walter Mumma left certain assets to be held in trust for the benefit of his grandchildren (Robert II, Barbara, Linda and Lisa), including a quarry in Silver Springs, Cumberland County. Before the Auditor, Robert II introduced three documents relating to the title of the Silver Springs quarry. The first two are from proceedings before the Dauphin County Orphans' Court and reflect that on the 1961 dissolution of a company called Highspire Sand & Gravel, the Silver Springs quarry was to be distributed to Walter Mumma's estate. Auditor Hearing, 4/22/10, exs. 01-96, 01-97. The third was a deed of the Silver Springs quarry dated August 9, 1961 from the liquidating trustees for Highspire Sand & Gravel and the executors of Walter Mumma's estate to Pennsy Supply. Auditor Hearing, 8/5/09, ex. 01-64. The testimony and documents introduced at the hearing confirmed that the Silver Springs quarry thereafter remained an asset of Pennsy Supply Inc. — renamed Nine Ninety-Nine, Inc. in 1982, Auditor Hearing, 6/4/10, ex T-103, ¶¶ 16-17 — which is exactly how Widow and Lisa treated it. Perhaps most notably, Robert II himself alleged in a 1990 complaint filed in Cumberland County that Nine Ninety-Nine, Inc. was "a family-owned holding company, whose principal assets are (1) Pennsy Supply, Inc., a wholly-owned subsidiary … and (2) the Silver Springs Quarry." Auditor Hearing, 6/14/10, ex. T-162, ¶

2. Thus, the record was consistent with the Auditor's and the Orphans' Court's rejection of Robert II's contentions regarding the purported relevance of Walter Mumma's will to an assessment of the administration of Robert Sr.'s Estate and Trusts.

Regarding Pennsy Supply Company, the evidence shows that (1) Robert Sr. owned over ninety percent of Pennsy Supply stock since 1961, Auditor Hearing, 12/14/09, ex. T-4; (2) after Robert Sr.'s death, Robert II alleged in a complaint filed in Cumberland County that "the shareholders of Pennsylvania Supply Company" included "the Estate of Robert M. Mumma", Auditor Hearing, 6/14/10, ex. T-162, ¶ 13; (3) in December 1990, Robert II alleged in another Cumberland County complaint that Robert Sr. "was a shareholder" of Pennsy Supply and that "his shares in [Pennsy Supply] passed on his death to the Estate …", Auditor Hearing, 6/14/10, ex. T-163, ¶ 2; (4) the Cumberland County Court of Common Pleas found, following a bench trial, that "at the time of Robert Sr.'s death, … the Estate owned approximately 98 percent of the stock of Pennsy Supply," Auditor Hearing, 6/14/10, ex. T-95, Finding 3(a); and (5) the same court found that Robert II executed an agreement among tenants-in-common in connection with the liquidation of Pennsy Supply Company reflecting that Robert Sr.'s Estate owned 98.0612% of the stock of that corporation, *Id*., Findings 16, 17, 37. This evidence amply supported the Auditor's finding that at the time of

Robert Sr.'s death, he owned well over ninety percent of the outstanding shares in Pennsy Supply. Auditor's Report, 8/5/13, Finding 302.b.

The fourth argument in Robert II's Questions Presented is that the Orphans' Court abused its discretion "in [refusing to] vacate an order from July 30, 2012 where [Robert II] failed to create a record in support of his request." It is difficult to understand the nature of this objection, but in any event, Robert II waived this issue by failing to present argument on this subject in his brief. **Green**, **supra**, 69 A.3d at 285 n. 3.

Fifth, Robert II contends that the Orphans' Court "err[ed] in holding an argument court when it was not presented a plan of distribution of Estate assets." Once again, Robert II waived this issue by failing to present argument on this subject in his brief. **Green**, **supra**, 69 A.3d at 285 n. 3.

Sixth, Robert II contends that the Orphans' Court "err[ed] in confirming any accounts when the plan of distribution of Estate assets into those accounts was never confirmed." Robert II is incorrect. The plan of distribution of Estate assets is not at issue in this stage of the litigation, because "the parties indicated" during oral argument on the objections to the Auditor's report "that it would be premature at this time to approve a certain schedule of distribution." Opinion I, at 27 n. 105. Presumably, the plan of distribution and its confirmation will take place at some point following the present appeal.

Seventh, Robert II insists that he had the right to a jury trial to determine "the disputed ownership of assets carried on the estate inventory." Robert II waived this argument by failing to raise it in his Pa.R.A.P. 1925(b) statement of matters complained of on appeal. *See Hess v. Fox Rothschild, LLP,* 925 A.2d 708, 803 (Pa.Super.2007) (any issue not raised in appellant's statement of matters complained of on appeal will be deemed waived for purposes of appellate review).

The Argument section in Robert II's brief includes issues which he neglected to mention in his "Questions Presented". We will overlook this error because it does not pose a substantial impediment to appellate review. *Cf. Booher v. Olczak*, 797 A.2d 342, 344 (Pa.Super.2002) (appellate court would not quash appeal from judgment on the pleadings despite plaintiffs' failure to attach copy of trial court's memorandum opinion to brief, because that violation did not prevent appellate court from determining the merits of issues raised).

The first issue not raised in Robert II's "Questions Presented" is that Article Thirteenth of Robert Sr.'s will precluded sales of family businesses to non-family members. Article Thirteenth provides:

> Notwithstanding the powers herein otherwise given, I direct that my stock in privately held corporations, supervised and administered by me as the Executive or operating officer prior to my decease or my stock in privately held corporations which otherwise is owned by me at my decease be not sold unless all of my trustees, shall agree in writing that such stock shall be sold. It is my desire that if expedient and possible, the businesses which I have personally directed during my lifetime

- 26 -

> and of which I have had an interest be continued for the benefit
> of under the management and control of my immediate family.

The Orphans' Court properly rejected this argument for much the same reasons as Barbara's challenge to Articles Seventh and Eighth of the will: Robert, Sr.'s "desire" that businesses remain in the family was mere precatory (non-binding) language. Opinion I, at 12-14. This argument also fails under the law of the case doctrine. The Orphans' Court held in 1989 that Article Thirteenth did not provide Robert II a right of first refusal as to sales of family assets, and Robert II subsequently discontinued his appeal of this issue. *In Re Estate of Mumma*, No. 21-86-398, Opinion and Order at 15 (O.C. Cumberland County, March 8, 1989), *appeal discontinued*, 206 HBG 89 (May 18, 1989).

Finally, Robert II objects to the Orphans' Court's determination that he should reimburse the Trusts in the amount of $521,160.21, or fifty percent of both the costs of the proceedings before the Auditor plus the attorneys' fees incurred by the Trusts in those proceedings.

Where the costs of an audit hearing result from the conduct of one of the objectors, the Court has discretion to tax that party with the costs of the proceeding. *In re King's Estate*, 7 A.2d 297, 298 (Pa.1939). Moreover, pursuant to 42 Pa.C.S. § 2503, "reasonable counsel fees" may be appropriate, among other circumstances, based on "dilatory, obdurate or vexatious conduct during the pendency of a matter or where "the conduct of

another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith."

Throughout the hearings before the Auditor, Robert II engaged in repetitive questioning of witnesses, consuming days of hearing time with examinations regarding irrelevant entities and matters. Robert II serially arrived late for scheduled sessions, stormed out of the proceedings and disregarded instructions that he be prepared with copies of documents he intended to introduce as exhibits. *See*, *e.g.*, Auditor Hearing, 8/6/09, at 2335-36 (Robert II left hearing session and did not return); Auditor Hearing, 4/27/10, at 5824-25 (Robert II left courtroom shortly after start of hearing session and did not return); Auditor Hearing, 4/28/10, at 5965, 6045 (Robert II failed to appear for start of hearing session and arrived well over an hour late); Auditor Hearing, 6/14/10, at 6671 (Robert II abruptly ended questioning of Lisa and left hearing shortly after start of day's proceedings); Auditor Hearing, 6/15/10, at 6880 (Robert II failed to appear for hearing); Auditor Hearing, 6/16/10, at 6990 (Robert II failed to appear for hearing); Auditor Hearing, 5/24/11, at 771-91 (Robert II unprepared to proceed with evidence in support of objections). The Auditor further noted, and the record reflects, that Robert II

> called many witnesses who were adverse to his position and attempted to re-litigate every matter which had been determined by this Honorable Court and other courts. He was obdurate and attempted to delay and prolong hearings. His conduct was extremely unprofessional towards the Court, my position, the other attorneys and the opposing parties. Most of

[what] he presented was irrelevant to the proceedings. He called witness after witness and would continually ask to reach a relevant issue but continually attempted to return to issues that had long been decided by this Honorable Court and other courts. He repeatedly promised to present credible relevant evidence, but did not meet any of his promises.

Auditor's Report, Conclusion of Law 52. For these reasons, the Orphans' Court acted within its discretion by deeming Robert II's conduct "'obdurate' and 'unprofessional' toward the Court, [the Auditor's] position, the other attorneys and opposing parties." Opinion I, at 24-25.

## **Barbara's Appeal at 1322 MDA 2014**

This appeal concerns Barbara's challenge to the order entered July 7, 2014 which, *inter alia*, authorized Lisa to vote shares of Bobali Corporation stock owned by the Residual Trust.

Barbara's first argument resembles her argument at 905 MDA 2014, viz., the will requires distribution of .3511 shares of Residual Trust stock to each child based on the "share and share alike" language in Article 8. This argument fails for the same reasons given on pages 11-15 above: (1) Robert Sr.'s will expressly gave the trustee discretion to distribute trust assets through other means than "in kind", (2) the will's language stating Robert Sr.'s "wish" that the businesses remain in the family is precatory and non-binding; and (3) the law of the case doctrine precludes this argument, because this Court has twice before rejected "share and share alike" arguments.

In her second argument, Barbara maintains that even if the Residual Trust is the "legal" owner of the 1.4044 shares, the remaindermen are "beneficial" owners of all the assets in the Residual Trust and therefore can direct Lisa how to vote the stock in her capacity as trustee. Barbara cites two cases from Delaware as support for this proposition: *In Re Canal Construction Co.*, 182 A. 545, 548 (Del.Ch.1936), and *In Re Giant Portland Cement Co.*, 21 A.2d 697, 702 (Del.Ch.1941).

The Orphans' Court properly rejected Barbara's argument. A fundamental statutory prerogative of the trustee is "the power … to vote a security, in person or by general or limited proxy, with or without power of substitution." 20 Pa.C.S. § 7780.6(a)(14). This statute, as well as the broad powers given to Lisa as trustee in the trust documents, authorizes her to vote the stock in any way that she deems to be in the best interests of Bobali, regardless of the wishes of the remaindermen. Delaware law is not binding, because Bobali is a Pennsylvania corporation, not a Delaware corporation. Also, the Orphans' Court correctly determined that the Delaware cases cited by Barbara actually support Lisa's authority. With regard to *Canal Construction*, the Orphans' Court reasoned that "the trust's ownership interest [in the case at bar] was far superior to that of [the] estate administrator [in *Canal Construction*] who attempted to vote shares of stock that he had already endorsed for transfer and delivered to estate beneficiaries prior to closing the estate." Pa.R.A.P. 1925(a) Opinion,

July 7, 2014 ("Opinion II"), at 4. **_Giant Portland Cement Co._** held that the record owner of shares of a corporation who had assigned his shares to a third party was technically the trustee for the assignee, yet he still had the right as trustee "to vote the stock standing in his name." **_Id_**., 21 A.2d at 701. This decision, the Orphans' Court correctly observed, "is actually more supportive of [Lisa's] position than that of [Barbara]." Opinion II, at 4.

For these reasons, we affirm the Orphans' Court's orders.

Orders affirmed. Application to quash appeal at 905 MDA denied as moot. Application to quash appeal at 921 MDA 2014 denied as moot. Application to dismiss appeal at 921 MDA 2014 denied as moot.

Judgment Entered.

_[signature]_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/2/2015