J-A25036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF MARY M. BEIDL | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: JILL A. BEIDL | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1069 WDA 2021 |

Appeal from the Order Entered August 6, 2021
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  31 OC 2021

BEFORE:  KUNSELMAN, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:          **FILED: NOVEMBER 29, 2022**

Jill A. Beidl (Jill) appeals from the August 6, 2021, order entered in the Jefferson County Court of Common Pleas, which denied her petition for rule to show cause why her brother, Robert D. Beidl (Bob), should be disqualified as a co-executor of the estate (Estate) of their mother, Mary M. Beidl (Mary).[1] Jill claims the orphans' court erred and abused its discretion by: (1) holding a hearing on issues that were not before it; (2) denying her omnibus discovery motion; (3) denying her request to have two sibling beneficiaries testify remotely; (4) denying her petition for a protective order pursuant to Pa.R.C.P. 4012; (5) admitting certain medical records without the authors of the

_____

[1] The order in question is appealable as of right.  **See** Pa.R.A.P. 342(a)(5) ("An appeal may be taken as of right from the following orders of the [o]rphans' [c]ourt Division: . . . [a]n order determining the status of fiduciaries . . . in an estate [.]").

documents being available to testify; and (6) failing to remove Bill as a co-executor.  Based on the following, we affirm.

In denying Jill's request for relief, the orphans' court made the following findings of fact:

> In her last will and testament, executed on March 23, 1990, the decedent, Mary . . . designated Jill and Bob as her co-executors in the event that her husband was unable or unwilling to serve.  She later named them and their brother[, Timothy Beidl,] as her agents under a durable power of attorney ("POA").  Predeceased by her husband, she passed away on October 3, 2020.
>
> After Mr. Beidl's death, Bob and his wife, Kim Beidl ("Kim"), moved in with Mary.  The three lived together at the family farm, located at 858 Glenn Road, Cosica, PA, for the next eight years.  Bob and Kim moved out in July of 2018, and Mary continued to live alone at the property until August of 2020.  She then moved in with her daughter, Darlene Kersey ("Darlene") after being hospitalized and outfitted with a thoracic catheter that required daily draining.
>
> Nineteen months earlier, Mary had been diagnosed with breast cancer for a second time and shared with Darlene in the spring of 2020 that she was experiencing a burning sensation in her chest.  She had lost one breast to cancer years earlier and likely understood what was happening, and whether driven by that knowledge or something else, she advised Bob in May that she was thinking about selling the farm and asked him to secure an appraisal.
>
> A licensed real estate agent familiar with the relevant players, Kim contacted James Reed ("Reed") on her husband's behalf and asked him to undertake a market value appraisal of Mary's property.  The two were familiar with one another from previous real estate transactions but did not have a personal or close professional relationship, and Reed accepted the assignment.
>
> Fully aware that Mary was his client, . . . it was she to whom Reed directed his questions when he visited the property on May

26, 2020. She advised him that she wanted the appraisal for decision-making purposes, readily answered his questions, and was generally knowledgeable about all aspects of the farm. Bob was present, as well, but his participation was limited to filing in a couple of gaps relative to the 2018 roof replacement.

Following the same process he had employed for three decades, Reed soon delivered his formal appraisal, which reflected an estimated market value of $315,000.00. Thereafter, Bob proposed that Mary sell the farm to him. He did not suggest a price, though; Mary arrived at $255,000.00 on her own after reviewing Reed's report. That number coincided with the sales price of two of the three comparable properties shown on page four. That number would also include the farm equipment, she decided, with the sale in its entirety being contingent upon Bob securing a conventional mortgage or home equity loan.

Darlene was present on September 1, 2020 as Kim reviewed each provision of the sales agreement with Mary and on September 14, 2020 as Laura Dunkel explained the closing documents. By the latter, Mary's physical health was quickly deteriorating; she became tired very quickly. Darlene did not observe signs of mental impairment either time, though. It seemed to her that Mary fully understood each document presented to her.[1]

_____

[1] Because Bob and Kim did not execute the closing documents until September 24, 2020, the sale was not finalized until that date.

_____

Throughout the course of the sale, Mary acted as her own agent; Bob did not sign anything on her behalf or otherwise use his POA powers to effectuate the transaction. It was his belief, in fact, that he was authorized to act in that capacity only if his mother was unable to act for herself. When her physical condition prevented her from writing legibly, therefore, Bob utilized the POA to write a few checks on her behalf, albeit at her behest, because even though her body sometimes refused to cooperate with the mechanics of writing a check, she was still making her own financial decisions.

Although Bob held her POA, it was Darlene with whom Mary was the closest during the last couple of years of her life. Even before Bob moved in 2018, the two women saw one another nearly every day, and it was Darlene in whom Mary reposed the greatest trust and who became her primary caretaker from August 12, 2020 until the day she died. Darlene thus knew long before the transaction was consummated that Mary intended to sell the farm to Bob for $60,000.00 less than its appraised market value. She also knew that Mary's decision to do that was entirely volitional and that Bob was not pressuring her in any way.[2] Whether she agreed with its terms or was simply inclined to respect her mother's wishes, therefore, Darlene did not attempt to modify or stop the sale. As she observed events on September 1, 2020 and September 14, 2020, moreover, she knew she was witnessing the fulfillment of a decision Mary had made approximately three months earlier.

_____

[2] To that end, Darlene and Bob's testimony was entirely credible. Both testified without contradiction that Darlene and Mary were close, and Darlene's efforts on her mother's behalf painted a clear picture of a woman looking out for her mother's best interests. The Court may reasonably infer, therefore, that Darlene would have raised an objection had she independently questioned the propriety of the sale and that Mary would have confided in Darlene if selling the farm to Bob for $255,000.00 had been something he was pressuring [her] to do rather than something she wanted to do.

_____

Unlike Darlene, Jill did not approve of the sale. Long estranged from her brother, she was suspicious of the transaction; she believed that Bob had taken advantage of Mary while she was in a weakened mental state, imposing his will to get a favorable deal on the farm. Nonetheless, she was not immediately certain that she wanted to act on her suspicions and thus was willing as of November 17, 2020 to serve with Bob as co-executors of Mary's estate. Bob was likewise willing and asked her to provide "several dates" when they and their attorneys could meet at the courthouse to open the estate. No less distrustful of Jill than she was of him, however, he also sought assurances that all of their mother's assets would be properly valued and included in the estate accounting.

- 4 -

From the outset, the siblings elected to communicate through counsel, Thomas R. Coyer, Esq. speaking on Jill's behalf and Terry R. Heeter representing Bob, and in a letter dated December 17, 2020, Attorney Coyer advised Attorney Heeter to contact Jill directly about serving as the estate's legal counsel since she had only retained him to represent *her*, not the estate. Apparently uncomfortable with that course of action, though, Attorney Heeter sent another letter to counsel in which he sought to ascertain whether Bob and Jill were in agreement regarding which siblings owned eight specific items of Mary's personal property, six of which comprised the "machinery," i.e[.], farm equipment, he had purchased in conjunction with the farm. Proffering the reason for his inquiry, Attorney Heeter explained, "If your client agrees with the position as stated herein and there are no other issues that need addressed, I will proceed to perform the Estate administration. If not, then our clients are at odds and I do not believe I should represent the Estate."

Jill did not agree with her brother's position, though. More than that, she interpreted Attorney Heeter's inquiry as Bob's declaration that he would not cooperate to open their mother's estate unless she conceded that he was the rightful owner of the farm and farm equipment. That perceived ultimatum, it seemed, helped to cement her decision to challenge his purchase of the family farm.

Patricia Moore ("Trish") sided with Jill. Mary, she believed, would not have wanted Bob to have the farm. She did not support that assertion with credible evidence, however. Clearly *she* was dissatisfied with the manner in which Bob maintained the house while he and Kim lived there. The Court will not presume that Mary shared her dissatisfaction, though, or, even if that were the case, that it would cause her to want to keep her son from ever owning the property.

Also unsupported was Trish's conclusion that Mary lacked capacity when she executed the sales documents, as well as the attendant implication that Bob finagled the situation in furtherance of his long-standing goal to acquire the farm. Whether or not Bob hoped to one day take the title to the property, the facts to which Trish testified belied her conclusion about Mary's mental state at the relevant time. Specifically, she told the Court that she and her mother spoke[ ] briefly every day

after her thoracic catheter was inserted and that Mary was always "lucid" during those conversations. Their brevity she then attributed, not to a mental defect that made conversation difficult, but to the fact that her mother tired quickly. Because Trish did not arrive at Darlene's until September 16, 2020, that necessarily means that she had brief but "lucid" conversations with Mary on both September 1, 2020 and September 14, 2020.

Danielle Abrahamson ("Abrahamson")[, a physician's assistant who treated Mary for seven years,] and the hospice records further belied the idea that Mary's cognitive functioning was compromised during the first half of September. Consistent with Darlene's testimony, Abrahamson related that Mary's conduct and conversation struck her as entirely appropriate when the two met on September 4, 2020 to discuss the older woman's treatment options. Mary had been her patient for seven years by then, and based on their history, Abrahamson was confident that Mary understood her choices and was making an informed decision to refuse further treatment and enter hospice care. Her hospice care began the following day, and with one exception — that being a one-time change in her orientation on September 20, 2020 — she was noted as being "alert" and "oriented x 4" during each of the eight nurse visits she received between September 5, 2020 and September 22, 2020. September 20, 2020, Darlene recalled, was the date Mary was fitted with a foley catheter and received her first dose of a narcotic.

Orphans' Ct. Op., 8/6/21, at 1-5 (record citations omitted; italics in original).

On April 21, 2021, Jill filed petition for rule to show cause why Bob should be disqualified as a co-executor of the Estate, claiming: (1) Robert refused for over six months to exercise his duty as named co-executor; (2) a *prima facie* case existed that Robert breached his fiduciary duty as POA during the sale of Mary's home to himself; and (3) therefore, the "surreptitious sale of [Mary]'s home to [Robert] will be an unavoidable issue for litigation before a probate court for whomever is named as Executor/rix of the estate as representative of the beneficiaries thereof, and thus that an inherent conflict

of interest exists in [Robert] being named as Co-executor. *See* Jill's Petition for Rule to Show Cause, 4/21/21, at 4 (unpaginated).

The orphans' court scheduled a hearing regarding the petition for June 21, 2021.

Meanwhile, on May 24, 2021, Robert filed an answer and new matter to the petition. He indicated that he lived on the farm for numerous years, and then "moved out . . . in July of 2018 because of [a] conflict with his siblings, but returned to the farm on a regular basis to maintain the farm in a manner acceptable to [Mary]." Robert's Answer & New Matter to Petition for Rule to Show Cause, 5/24/21, at 9. He admitted that his wife prepared the sales agreement for the property at issue, but alleged that "[Mary] executed the agreement of sale at a time when she was competent, in control of her mental abilities and acted of her own free will and according to her wishes and desires." *Id.* at 4. Robert further stated:

> 19. It was [Mary]'s desire that the farm be given to [Bob], but to try and keep peace in the family, [Mary] reluctantly agreed to sell the farm to [Bob].
>
> 20. To arrive at a price for the farm, [Mary] reviewed the appraisal with [Bob] and stated that she would accept $255,000 for the farm and the equipment.
>
> 21. The appraisal identified two comparables at a price of $255,000 which [Mary] felt was adequate consideration for the farm and the equipment.

*Id.* at 7.

Jill filed a response, refuting Bob's assertion that Mary wanted him to have the farm, alleging that she had a conversation with her mother on August 15, 2021, and "[Mary] was vehemently opposed to [Bob]'s owning the subject farm, as evidence by the fact that he admittedly lived there for eight . . . years and yet received no ownership interest whatsoever therein from [Mary]." Jill's Answer to Bob's "New Matter," 6/11/21, at 1 (unpaginated).

On June 17, 2021, Jill filed a motion to allow remote testimony, averring that she intended to call two witnesses, Timothy and Trish — both siblings and beneficiaries of the Estate. Jill indicated "their in-person attendance and testimony would constitute a severe hardship for both." Jill's Motion to Allow Remote Testimony, 6/17/21, at 1 (unpaginated). That same day, the court entered an order, stating the motion was moot because:

> [Jill's] own request was for Oral Argument and, therefore, no witnesses shall be called for Oral Argument, there is no need to rule on the Motion for Remote Testimony as no testimony is ever requested for Oral Argument. Accordingly, after . . . Oral Argument, if a hearing becomes necessary, the Court will discuss at that Argument how testimony should be presented.

Order, 6/17/21.

On June 21, 2021,[2] after argument and discussion, the court ordered that an evidentiary hearing be held on July 6th, which was later continued to July 19th. *See* Order of Court, 6/23/21; *see also* Order, 6/25/21.

_____

[2] The order was timestamped two days later.

During this time, on July 12, 2021, Jill filed an omnibus discovery motion, concerning the specific diagnoses that were made of Mary's condition, the level of care that she received during her last few weeks, the drugs she was taking and their effect on her, the actual market value of the home, and the management of her other financial dealings. *See* Jill's Omnibus Discovery Motion, 7/12/21, at 2 (unpaginated). Jill also alleged that Bob refused to allow her entrance onto the property so that an "independent appraisal" could be conducted, and she was requesting the court grant such relief. *Id.* at 3 (unpaginated). The court denied that motion one day later. *See* Order of Court, 7/13/21.

On July 14, 2021, Bob provided Jill with a notice of the videotaped deposition of Danielle Abrahamson, MPAS, PA-C, would take place on July 16, 2021. As mentioned above, Abrahamson is a physician's assistant who treated Mary for seven years and met with Mary on September 4, 2020, after Mary had been diagnosed with metastatic cancer and decided to forgo further treatment. *See* Orphans' Ct. Op., 8/6/21, at 4-5.

In response, Jill filed a petition for a protective order pursuant to Pennsylvania Rule of Civil Procedure 4012. She alleged, *inter alia*, that when the court denied her omnibus discovery motion,

> such a ruling . . . indicate[d] to those attempting to abide by it that discovery is not to take place in the instant case prior to the [July 19, 2021, oral argument] hearing, including interrogatories . . . under Pa.R.C.P[.] Rule 4003.5 which would have at least allowed [Jill] to inquire as to expert witnesses [Bob] intended to call as a witness at trial and reports created by said witnesses

setting out materials, facts, etc. relied upon by said expert witnesses.

Jill's Petition for Protective Order – Pa.R.C.P. 4012, 7/14/21, at 2 (unpaginated). She stated that Bob's proposed deposition was "contraindicative" of the court's order and requested that said deposition be "disallowed[.]" *Id.* at 2-3.

Bob replied that Abrahamson's testimony would be beneficial to the court "in determining the ability of [Mary] to understand, comprehend and knowingly make important decisions as of September 4, 2020." Bob's Response to Motion for Protective Order – Pa.R.C.P. 4012, 7/15/21, at 2. Moreover, Bob alleged Jill's "interpretation of the [c]ourt orders is without merit inasmuch as the [c]ourt in no way placed any limits on the parties' ability to perform discovery." *Id.* at 4. Upon consideration of Jill's petition and Bob's response, the court ordered that Abrahamson's deposition would take place on July 16, 2021. *See* Order of Court, 7/15/21.

On July 19, 2021, the court held a hearing on the instant petition. Four of the five siblings (Bob, Jill, Darlene, and Trish) testified.[3] James Reed, who conducted the appraisal for Mary, and Laura Dunkel, who was the closing agent at the property sale, both testified about their interactions with Mary in

_____

[3] The remaining sibling, Timothy, was unable to attend the hearing due to financial hardship. *See* N.T., 7/19/21, at 190. Jill's counsel presented an affidavit from Timothy to the court, in which he averred that he joined Jill and Trish in their concerns that Bob be removed as a co-executor. *Id.* at 190-91.

- 10 -

those final months. Thereafter, the court denied Jill's petition to disqualify Bob as co-executor. *See* Order, 8/6/21. The court also entered an order, disposing of numerous objections made by Jill during the Abrahamson deposition. *See* Order Disposing of Objections, 8/6/21, at 1-3. This appeal followed.[4]

Jill raises the following issues on appeal.

A. Did the [orphans' c]ourt abuse its discretion in misapplying the law, and/or exhibiting manifest bias in holding a hearing on issues not before it?

B. Did the [orphans' c]ourt . . . abuse its discretion in failing to remove [Bob] as co-executor of [Mary]'s estate?

C. Did the [orphans' c]ourt abuse its discretion in denying [Jill]'s "Omnibus *Discovery Motion*?"

D. Did [orphans' c]ourt abuse its discretion in denying [Jill]'s request that her two (2) sibling beneficiaries testify remotely[?]

E. Did the [orphans' c]ourt abuse its discretion in denying [Jill]'s "*Petition for Protective Order – Pa.R.C.P. 4012*?"

---

[4] Though not ordered to do so, Jill filed a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal on September 8, 2021. The court issued a Pa.R.A.P. 1925(a) opinion on September 20, 2021.

Notably, Jill's concise statement contained eight errors. *See* Jill's Concise Statement of Errors Complained of on Appeal, 9/8/21, at 2-4 (unpaginated). But on appeal, she has abandoned two of those claims (burden shifting and weight). Accordingly, we need not address those issues. *See Commonwealth v. Briggs*, 12 A.3d 291, 310 n.19 (Pa. 2011) (declining to address claim raised with trial court in concise statement but subsequently abandoned in brief).

F. Did the [orphans' c]ourt err as a matter of law in admitting Hospice Records without the authors thereof being available for Cross[-]Examination?

Jill's Brief at 4 (italics in original).[5]

At first blush, there appears to be a timeliness issue with the filing of Jill's notice of appeal. Specifically, her appeal was taken from the August 6th order. Jill's notice was docketed on September 8th, more than 30 days after the entry of the order. **See** Pa.R.A.P. 903(a). This Court issued a rule to show cause why the appeal should not be quashed as untimely filed. **See** Order, 11/10/21. Counsel for Jill filed a response, stating that Jill "sent the instant appeal to Jefferson County with a courier on 3 September, 2021. . . . He filed the above-referenced pleadings on that date, and was told by Orphans' Court staff that [Jill]'s counsel would be a sent a receipt." Letter from J. Lansing Hills, Esquire, to Superior Court of Pennsylvania, 11/11/21, at 1. Counsel apparently issued an incorrect amount on the check that was attached to the notice of appeal, and shortly before close of business on September 3rd, "Jefferson County Orphans' Court notified by phone of the oversight and requested a new check." **Id.** at 1-2. Counsel stated he immediately mailed the check and "[a]dditionally discussed . . . an assurance by Orphans' Court staff that the timeliness of the filing would not be affected."

---

[5] Based on the nature of Jill's claims, we have renumbered them for ease of disposition.

*Id.* at 2.[6]  Based on these circumstances, we will treat the events concerning the filing as constituting a breakdown in the orphans' court's process, and, therefore, we will review the merits of Jill's issues.  ***See Sass v. Amtrust Bank***, 74 A.3d 1054, 1063 (Pa. Super. 2013) (a reviewing court is "unable to deem an appeal timely except under the narrowest of circumstances in which counsel for the offending party can establish either a breakdown in the operations of the judicial support system or extenuating circumstances that rendered him incapable of filing the necessary notice.").

Our standard of review regarding the matter is limited:

> "The removal of an executrix is a matter vested in the sound discretion of the trial court, and thus we will disturb such a determination only upon a finding of an abuse of that discretion."  ***In re Estate of Mumma***, 41 A.3d 41, 49 (Pa. Super. 2012).  The grounds for removal of a personal representative are delineated in 20 Pa.C.S. § 3182.  That statute allows the orphans' court to replace a personal representative when he or she "is wasting or mismanaging the estate, is or is likely to become insolvent, or has failed to perform any duty imposed by law" as well as "when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office."  20 Pa.C.S. § 3182(1)(5).

***In re Estate of Andrews***, 92 A.3d 1226, 1230 (Pa. Super. 2014) (footnote omitted).[7]  "An executor is required to exercise the same degree of judgment that a reasonable person would exercise in the management of his own estate.

---

[6] After receiving Jill's response, this Court discharged the rule to show cause but referred the matter to the merits panel.  ***See*** Order, 11/17/21.

[7] ***See also Scientific Living, Inc. v. Hohensee***, 270 A.2d 216, 223-24 (Pa. 1970).

- 13 -

This duty includes the responsibility to distribute the estate promptly." *In re McCrea's Estate*, 380 A.2d 773, 775-76 (Pa. 1977) (citations omitted). Moreover, we note:

> [Where a]n executor . . is chosen by the testator himself, . . . his appointment represents an expression of trust and confidence by the testator. Hence, his removal is a drastic action which should be undertaken only when the estate within the control of such personal representative is endangered. To justify the removal of a testamentary personal representative the proof of the cause for such removal must be clear.

*In re Estate of Lux*, 389 A.2d 1053, 1059 (Pa. 1978) (citations & quotation marks omitted). Lastly, "[t]he orphans' court's factual findings receive the same deference accorded factual findings of a jury, but we must ensure that the decision of the court is free from legal error." *In re Estate of Rosengarten*, 871 A.2d 1249, 1253 (Pa. Super. 2005).

Jill first claims that the orphans' court misapplied the law by holding a hearing that addressed Mary's mental capacity and other issues that were not directly raised in her petition. *See* Jill's Brief at 16. She states that her petition solely raised a *prima facie* case for Bob's purported conflict of interest as to the sale of the property at issue. *Id.* at 12-15. Relying on *Estate of Andrews* and other case law, Jill complains the court ignored the applicable law as to the burden of proof in "conflict of interest" cases. *Id.* at 17-20. Moreover, for the first time, she alleges that the court abused its discretion in exhibiting manifest bias and hostility towards her. *Id.* at 20-27. She states:

> Put in the clearest terms, the [orphans c]ourt eagerly embraced [Bob]'s errant position on the issues raised within [her] Petition,

thereafter simply changed *sua sponte* the focus thereof from [Jill]'s raising — and thus bearing the burden to prove — the conflict of interest found in [Bob] investigating possible improprieties [regarding] the sale of [Mary]'s home to him to the nonsensical burden of [Jill] having to prove that those improprieties, in fact, occurred in order to undertake the investigation of them as a fiduciary of [Mary]'s estate. . . .

*Id.* at 21. Jill further alleges the court "had a hard time containing its animus" towards her case and

that animus was at least ostensibly based in an errant belief that [she], in filing her Petition, had cast baseless and unproven aspersions against members of a small community, and should have rather already had in hand proof of self dealing, fiduciary breach, undue influence, lack of [Mary]'s capacity, etc. prior to filing her Petition and/or requesting the instant hearing. . . .

*Id.* at 24. She claims that she had no discovery powers, had lost all access to Mary's medical and financial records once her mother passed away, and was not informed of the sale until a few day earlier — therefore, her only options were to open the estate with Bob or bring the instant action, and she chose the latter "in order to guarantee her unimpeded access to the very materials the [orphans' c]ourt took animated exception to her not having at the [July 19th] hearing, and after denying her request for discovery a week prior." *Id.* at 24-25.

A review of the record reveals that the basis of Jill's petition to disqualify Bob as co-executor focused on allegations that: (1) Bob "inexplicably" had Mary's home appraised by a colleague of his wife's and the value of the property was determined to be $315,000; and (2) shortly before her death, Mary, "through the haze of illness, old age, and morphine – managed to sign

a deed for her home" for $255,000.00. Jill's Petition for Rule to Show Cause

at 2-3 (unpaginated). Jill further pled that Bob

> **engaged in self-dealing** as [Mary]'s POA and thus violated his fiduciary duty to maximize [her] financial estate by essentially selling himself [Mary]'s home at an approximate twenty percent (20%) discount, and/or **exercised undue influence** over [Mary] regarding the sale of her home, and/or that [**Mary**] **did not have adequate capacity to fully participate as a party to said sale**.

*Id.* at 3-4 (unpaginated) (emphases added).

> In addressing the issue, the orphans' court found the following:

> [Jill] did not allege in a vacuum that her brother should be removed as co-executor on account of a conflict. He was conflicted, she said, because he did or may have breached a fiduciary duty as [Mary]'s POA, exerted undue influence over the decedent while she was too weak to exert her own will, and thereby secured for himself a property deal beneficial to him and detrimental to the estate. In order to render an informed and appropriate decision on the ultimate issue, therefore, it was necessary for the Court to assess the validity of the facts upon which [Jill] sought [Bob]'s removal. As the case law unequivocally states, a court may not remove a named executor without clear evidence that his or her involvement will prove harmful to the estate, which means that [Jill] herself put directly at issue the ancillary questions the Court addressed in its opinion. [Bob] apparently recognized the evidentiary implications of [Jill]'s petition and came to the hearing prepared to counter her claims of undue influence, breach of fiduciary duty, etc., and that she was not equally prepared to advance her own position did not make the Court wrong for rendering the findings necessary to decide the ultimate issue.

Orphans' Ct. Op., 9/20/21, at 1.

We agree with the court's sound reasoning. Contrary to Jill's argument,

she did raise the question as to whether Mary had the capacity to participate

in sale of the property she owned. Indeed, in her petition, she alleged that

- 16 -

Mary was elderly, ill, and on morphine at the time she signed the deed. This issue needed to be addressed as it was the prerequisite to her main question – whether Bob exerted undue influence in his capacity as Mary's power of attorney with regard to the property sale. Therefore, Jill's contention that the court misapplied the law by assessing Mary's capacity is without merit. Moreover, to the extent that Jill alleges the orphans' court was biased, we note that this issue is waived. **See Jordan v. Pennsylvania State Univ.**, 276 A.3d 751, 762 (Pa. Super. 2022) ("It is well settled that a party may not raise the issue of judicial prejudice or bias for the first time in post[-]trial proceedings. On the contrary, a party seeking recusal or disqualification on the basis of judicial bias or impartiality [is required] to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred.") (citations & quotation marks omitted). Accordingly, Jill's first claim fails.

Next, Jill argues the court abused its discretion by failing remove Bob as co-executor. **See** Jill's Brief at 49. She states that since Bob had "an inexorable personal interest in the propriety of the sale . . . to him being upheld[,] his fiduciary duty to objectively investigate his own potential impropriety presents an undeniable conflict of interest with his personal interest in being cleared of that very potential impropriety." **Id.** at 51. Moreover, she contends that Bob "has literally proven to be the impediment to adequate investigation of the potential claims [Jill] alleged he would be in

his refusal to allow an independent appraisal of the subject home." *Id.*
Moreover, she points to the following as proof for Bob's disqualification: (1)
he purchased the home for $60,000 less than its market value per the
appraisal; (2) he was Mary's POA while she was "ill and ostensibly medicated
under hospice care;" (3) the sale of the property took place mere days before
Mary's death *via* a sales agreement drafted by Bob's wife and done without
notifying Jill, Trish and Timothy of the sale; and (4) there was a long-standing
conflict among the siblings. *Id.* at 52. Jill further described "the enmity
between the various siblings" as being "palpable" and therefore, "indicia" of
Bob's conflict of interest. *Id.* at 54-55. She concludes, "It simply cannot be
asserted that significant 'ill feelings" do not exist[ ] between [Bob] and the
majority of his beneficiary siblings, including [Jill] with whom he is ostensibly
to work collaboratively as co-executor of [Mary]'s estate." *Id.* at 56.

In addressing this issue, we are guided by the following caselaw
regarding an allegation of undue influence and the removal of an executor or
personal representative.

Undue influence is a "subtle, intangible and illusive thing, generally
accomplished by a gradual, progressive inculcation of a receptive mind." *In
re Estate of Fritts*, 906 A.2d 601, 607 (Pa. Super. 2006) (citation omitted).
To prove undue influence, a contestant must establish

> (1) the testator suffered from a weakened intellect at the time the
> will was executed; (2) there was a person in a confidential
> relationship with the testator; and (3) the person in the

- 18 -

confidential relationship received a substantial benefit under the challenged will.

*In re Estate of Nalaschi*, 90 A.3d 8, 14 (Pa. Super. 2014). "Once these three elements are established by the contestant, the burden shifts back to the proponent to prove the absence of undue influence by clear and convincing evidence." *In re Bosley*, 26 A.3d 1104, 1108 (Pa. Super. 2011).

Regarding "weakened intellect," this Court has previously explained:

Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. In a case of undue influence, a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date that the contested will was executed. However, if the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. Our review of the court's factual findings is limited to considering whether those findings have support in the record.

*Fritts*, 906 A.2d at 607 (citations, brackets and quotation marks omitted).

Moreover, with respect to "a confidential relationship, this Court has stated:

A confidential relationship exists whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other. . . . Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest. Further, the existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the parties. In fact, no clearer indication of a confidential relationship can exist than giving another person the power of attorney over

- 19 -

one's entire life's savings.  This is particularly true when the alleged donee is shown to have spent a great deal of time with the decedent or assisted in decedent's care.

*Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. 1995) (citations, brackets, quotation marks & paragraph break omitted).

In *In re Rafferty's Estate*, 105 A.2d 147 (Pa. 1954), the Pennsylvania Supreme Court held: "The personal interest of a fiduciary being in conflict with that of the estate and the unfriendly feeling between the heirs constitute sufficient cause for removal." *Id.* at 148.

Subsequently, in *In re Estate of DiMarco*, 257 A.2d 849 (Pa. 1969), the Supreme Court distinguished *Rafferty*, noting that that the personal representative removed in that case was an administrator — not an executor chosen by the testator.  *Id.* at 855.  The *DiMarco* Court ultimately concluded that "ill-feeling, *per se*, would not, in the absence of a showing of injury by reason thereof to the best interests of the estate, serve as a ground for [the co-executor]'s removal." *DiMarco*, 257 A.2d at 854.

More recently, *In re Estate of Westin*, 874 A.2d 139 (Pa. Super. 2005), the executor of the estate was an attorney, and one of his firm's employees had embezzled estate funds.  *Id.* at 142.  The attorney was removed as executor and, on appeal, a panel of this Court determined that the grounds for removal had been established based on the fact the attorney would be in a position of representing the estate in a claim against himself and his law firm.  *Id.* at 142-43.  The Court stated:  "Sufficient reason for

removal of a fiduciary has been found when the fiduciary's personal interest is in conflict with that of the estate, such that the two interests cannot be served simultaneously." *Id.* at 143. The Court further construed that "a conflict of interest [was] readily apparent from the circumstances," and therefore, the attorney's removal as executor was necessary. *Id.*

> Lastly, in ***Andrews***, which Jill relies on, it was alleged that the executrix
>
> was dissipating estate assets by disposing of various items of personality contrary to the terms of the will, that she was acting in contravention to the estate interests by failing to acknowledge to the attorney for the estate the significant indebtedness which the Personal Representative has to the decedent, and that she had failed to disclose other estate assets to the petitioners.

***Andrews***, 92 A.3d at 1229 (quotation marks omitted). The petitioners claimed the executrix had a conflict of interest in that she was the largest debtor of the estate and that she was self-dealing "by purchasing estate assets for less than fair market value and by removing personality without distributing it in accordance with the terms of the will." *Id.* The successor executrix promoted support of the prior executrix's position that the money did not have to be repaid to the estate. The orphans' court refused to appoint the successor executrix as representative of the estate upon the removal of the prior executrix. On appeal, this Court concluded that the orphans' court did not abuse its discretion, stating: "The fact that [the executrix] has . . . insisted that the money is not an estate asset and belongs to her establishes a clear and direct conflict of interest. While [she] may have good faith and reasonable basis to assert that the funds do not have to be repaid, this fact

- 21 -

fails to obviate her direct and substantial conflict." *Id.* at 1232 (citation omitted). As for the removal of the successor executrix, the Court decided that also was not an abuse of discretion because she would "neglect[ ] her duty to collect [the] estate debt" and would act contrary to the estate's interests. *Id.* at 1233.

Turning to the present matter, the orphans' court explained its rationale for denying Jill's request to remove Bob as co-executor as follows:

> One of the reasons a personal representative may be removed is because of ill feelings between him and a co-executor. Absent clear proof that those feelings actually endanger the estate, however, their mere existence is not sufficient. Similarly, a conflict of interest, though a recognized cause for removal, must be of such a nature that the personal representative cannot serve his own and the estate's interests simultaneously. Even where a conflict plainly exists, moreover, it does not necessitate removal if the personal representative, though having once taken actions adverse to the estate, is nonetheless willing to comply with the orphans' court's directives and rectify any prior self-dealing.

> The ultimate issue to be decided here, as Jill points out, is whether Bob must be disqualified as a co-executor due to a conflict of interest. The Court cannot decide that question in a vacuum, though; it cannot accept her legal conclusions without reference to the facts *she* has alleged. It thus cannot decide the ultimate issue without first deciding whether the evidence shows clearly that Bob breached his fiduciary duty as Mary's POA relative to the sale of the farm. Whereas Jill asserts that Bob secured the farm at a $60,000.00 discount by exerting undue influence on a woman rendered mentally infirm on account of her physical ailments and the medication she was taking to address them, moreover, whether Mary had the capacity to enter into the sale is indeed a central consideration. The evidence, though, does not support the allegations.

> Though in possession of a document granting him broad POA powers over his mother, Bob did not exercise them in relation to the property transaction. He believed, in fact, that his authority

- 22 -

to act as her POA inhered only if she became incapacitated. He thus acted solely on his own behalf when he signed the sales agreement on September 1, 2020[,] and watched while Mary did the same. He then was not even present when she executed the closing documents. Relative to the sale, therefore, Bob could only have breached his fiduciary duty as [Mary]'s POA if he used his position to unduly influence her decision to sell him the property and equipment for $255,000.00. The credible evidence says he did not.

To prove undue influence, Jill must establish at a minimum that Mary suffered from a weakened intellect and that she and Bob were in a confidential relationship. The evidence is insufficient on both points.

The proposition that Mary suffered from a weakened intellect on or before September 14, 2020[,] was little more than conjecture. Even Trish affirmed that her mother was engaging in lucid conversation between August 12 and September 16, 2020, which means that her conclusory assertion that Mary lacked capacity at any time prior to completion of the sale was contradicted by her own factual testimony. It was further contradicted by Abrahamson, who knew Mary as a patient for seven years, consulted with her just three days after the sales agreement was signed, and saw no evidence of mental incapacity. As demonstrated by the hospice records, moreover, her mental status did not change between then and September 14, 2020. Most telling, though, was Darlene's testimony.

Among the five siblings, Darlene was closest with Mary, and while she clearly did not share everything with her daughter, e.g., she withheld information about her latest cancer diagnosis, Mary relied on Darlene as a confidante, an ally, and ultimately her primary end-of-life caretaker. Darlene, therefore, was in the best position to gauge on a day-to-day basis whether her mother's physical ailments were negatively affecting her cognitive abilities and, more specifically, to ascertain whether she understood the documents she was signing on September 1, 2020[,] and September 14, 2020. Accordingly, the Court finds most persuasive her assessment that Mary, uninfluenced by Bob, dictated the terms of purchase and fully grasped the effectuating documents she executed in September.

The strength of Mary and Darlene's relationship further bolster's [sic] the latter's credibility on account of the reasonable inferences it invites, one being that Mary surely would have confided in Darlene had Bob been pressuring her to sell him the farm on terms with which she was not comfortable. More importantly, the Court can readily surmise that Darlene's loyalty lay with her mother and, therefore, that she would have tried to stop the sale or notified her other siblings, with whom she was on speaking terms at the time, had she entertained any reservations about its legitimacy. She did not have any reservations, though. On the contrary, she knew it was Mary's idea to sell the farm and equipment to Bob for $255,000.00; she knew that was what her mother, acting of her own free will, *wanted* to do.

In total, therefore, the evidence fails to establish that Mary suffered from a weakened intellect such that she was susceptible to pressure from her son with respect to the sale. It fails, moreover[,] to establish that Mary and Bob were in a confidential relationship.

As provided in **In re Estate of Smaling**[, 80 A.3d 485 (Pa. Super. 2013) (*en banc*)], a confidential relationship only exists where one party, whether because of his superior position, e.g., attorney versus client, or because of the other's weakened physical, intellectual, or moral state, dominates or manipulates the other to the end that he effectively imposes his own will on her. Whether the parties at issue are parent and child, principal and agent, or even husband and wife, the evidence must show clearly that the stronger party effectively imposed his will on the weaker party. With limited exceptions not relevant here, therefore, the existence [or] non-existence of a confidential relationship is a fact-based determination *. . .*, and in this case, the facts do not favor Jill's position.

As discussed above, what the evidence reveals about Mary is that she was fully possessed of her faculties and acting of her own volition when she sold the farm to Bob. What it reveals, moreover, is that Bob only proposed to buy it *after* Mary decided she was going to sell it and *after* she received Reed's appraisal. Even then, he did not pressure her to do so and was not involved in deciding the selling price. As Darlene credibly testified, Mary was an independent thinker who did not allow anyone besides her husband tell her what to do, and Jill did not present sufficient evidence from which the Court might reasonably conclude that

Bob was an exception. She thus did not present sufficient evidence from which the Court might reasonably conclude that he and his mother were in a confidential relationship.

"[T]he exercise of undue influence, at its core, indicates that an individual so influenced has lost the ability to make an independent decision." ***Yenchi v. Americprise Fin., Inc.***, 161 A.3d 811, 822 (Pa. 2017). So says our Supreme Court. Whereas Jill has failed to prove either that Bob purposed to influence Mary's decision to sell him the farm and equipment for $255,000.00 or that she was susceptible to his influence, therefore, she has failed to establish that the sale was occasioned by undue influence.

Finally, while Jill and Bob may be estranged, the evidence does not sustain the conclusion that they are so adverse to one another that their co-executorship will compromise the estate. Thus far, each has told the other that she or he is ready and willing to serve, and though Jill makes much of the fact that her brother has yet to advance a date for them to meet and open the estate, the fact is that she is equally culpable in that regard. Additionally, that Bob allowed Jill to come to the farm with an appraiser for Mary's personal property indicates that he is indeed willing to act in the best interests of the estate. At the same time, the Court does not interpret as evidence to the contrary his refusal to allow her to secure an independent appraisal of the property. Bob did not recognize the farm as an estate asset, but as *his* home, which he knew had been the subject of an unbiased and independent appraisal only a few months earlier. That being the case, the Court does not deem his unwillingness to indulge his sister's unfounded suspicions to be indicative of an unwillingness to dispose of Mary's estate in accordance with her stated wishes. Furthermore, the manner in which Bob conducted himself at the hearing on July 19, 2021[,] gave the Court no reason to believe that he would not comply with its instructions should its subsequent intervention become necessary.

In the end, then, Jill has not produced sufficient evidence to support any of the factual bases upon which she alleges that Bob has a conflict of interest that warrants his disqualification as co-executor of Mary's estate. That being the case, the Court will not disregard the testator's express wish that the two serve together to dispose of her estate's assets in accordance with her last will and testament.

Orphans' Ct. Op., 8/6/21, at 5-8 (italics in original; some citations omitted).

Keeping our standard of review in mind, we find no abuse of discretion in the orphans' court's decision to deny Jill's request to remove Bob as co-executor. We affirm on the basis of its rationale while adding these additional comments. The record refutes Jill's unsupported claims[8] as there was substantial credible evidence, which established that: (a) Mary had the capacity to enter into the sales agreement; (b) Mary independently made the decision to lower the sales price despite the appraisal; (c) Bob did not exert pressure on Mary to sell the farm to him and he was not involved in deciding the selling price; and (d) there was no conflict of interest on Bob's part with respect to his duty as power of attorney. *See* N.T. at 101-03 (James Reed's testimony), 114-16 (Laura Dunkel's testimony), 137-42 (Darlene's testimony). Furthermore, the evidence established Mary was not of weakened intellect — meaning she was not persistently confused, forgetful and disoriented — at the time of the sale. *See Fritts*, 906 A.2d at 607. Likewise, while Bob was one of Mary's POAs and as such, a confidential relationship existed, he was not living with Mary or assisting in her care at the time of the sale. *See Lakatosh*, 656 A.2d at 1383. Thus, the record was deficient of

---

[8] In fact, Jill even testified that in the preparation of her petition, she did not talk to any of Mary's physicians, her physician's assistant, the hospice nurses, or the appraiser. N.T. at 52-54. She also indicated that she was not present when the appraisal was conducted, the agreement of sale was completed, and the deed and closing documents were signed. *Id.* at 55.

any evidence to support the inference that Bob acted with undue influence over Mary.

Moreover, we recognize that while there was some animosity among the siblings, we reiterate the **DiMarco** conclusion that "ill-feeling, *per se*, would not, in the absence of a showing of injury by reason thereof to the best interests of the estate, serve as a ground for [a co-executor's] removal." **DiMarco**, 257 A.2d at 854. Here, in the absence of any other proof besides Jill's unsupported allegations, there was no showing of injury to the best interests of Mary's estate. Accordingly, her second argument fails.

Regarding her third claim, Jill asserts that the orphans' court abused its discretion by denying her discovery-related continuance request, after it *sua sponte* decided that it would hear argument on issues not properly before it, *i.e.* Mary's capacity. **See** Jill's Brief at 28. She states that "when it became clear that obtaining discovery from [medical] providers/financial institution[s] . . . was not practicable," she requested the court continue the July 19th hearing and establish a 90-day discovery period. **Id.** at 29. Jill contends the court "struck out a reference to a period for depositions" in her proposed order and that

> once the [orphans' c]ourt scheduled, and subsequently rescheduled, the hearing, given the requirements of, and temporal limitations set forth within, Pa.R.C.P. 4007.1, 4009.12 and 4009.21 *vis-à-vis* the dates the . . . [c]ourt set for the evidentiary hearing, successful discovery was rendered entirely impracticable. Let alone [Jill]'s ability to retain any expert to testify based on any documents or testimony obtained *via* such discovery.

*Id.* at 32. Jill reiterates her allegation of purported judicial bias, stating:

> [The court's] abuse becomes all the more starkly evident, and indicative of it[s] manifest bias against [her], when one considers it[s] decision the very next day to literally guarantee, over [her] strenuous objection, [Bob]'s deposition in *lieu* of testimony of the sole medical care provider presented as a witness at the instant hearing, and with less than [48] hours' notice to [Jill]'s counsel.

*Id.* at 34.

Jill also alleges the court abused its discretion by denying her request to enter onto the property for purposes of having her own appraisal conducted. Jill's Brief at 34. She contends that because she is asserting Bob engaged in self-dealing, "it makes absolute practical and equitable sense that [she] be allowed to obtain the proverbial 'second opinion' as to the actual market value of the subject property." *Id.* at 36. Jill maintains that in denying her request based on the theory that she had speculated the results were skewed in Bob's favor, the court "simply inferred that [she] was asserting that the appraisal was 'skwewed' [sic] despite her not stating that opinion at all" and that the court seemed "to have arrived at that pejorative assumption merely upon [her] pleading facts later borne out as true." *Id.* at 38. Notably, Jill "concedes" the "reasonability" of the court's "assumption," stating: "All the facts surrounding this appraisal and sale do inexorably lead an objective observer to just such conclusions as to potential impropriety; or at the least significant questions which, in turn, would bind any fiduciary to undertake an unbiased and unimpeded investigation of them." *Id.* at 39. Nevertheless, Jill asserts Bob's "outright refusal to allow even an independent appraisal of the

- 28 -

subject home, is not only emblematic of the very conflict of interest which [she] claims should disqualify him as executor, but also emblematic of the fact that he will act in his own interest when faced with that conflict." *Id.*

We apply an abuse of discretion standard of review when considering the denial of a continuance request. *See In the Interest of D.F.*, 165 A.3d 960, 965 (Pa. Super. 2017).

With respect to its order denying Jill's request, the orphans' court explained:

> Denying [Jill] a 90-day continuance so that she could conduct discovery was not an abuse of discretion. As the record discloses, she was prepared to prove her claim on June 21, 2021, errantly believing that the matter was scheduled for a hearing rather than an argument. She was also ready to make her case on July 6 but did not have the chance because her attorney had a scheduling conflict the Court accommodated by moving the hearing to July 19. Nonetheless, [Jill] knew on both June 21 and July 6 that [Bob], who had filed his answer and new matter on Mary 24, 2021, was denying her allegations and affirmatively claiming that [Mary] was lucid at all relevant times pertinent to the sale of the farm; that she alone had decided its selling after receiving an independent appraisal; and that he had not sought to influence her decision. Just [one] week before the hearing for which the Court had reserved an entire day, however, she asked the Court for a discovery-related continuance, indicating that she had just learned of [Bob]'s intention to call witnesses whose purpose would be "to rebut the specific allegations of [her] petition." Far from establishing "good cause" for the continuance, what [Jill]'s pleading thus indicated was that she had simply failed to appreciate the evidentiary implications of her own petition and thus was no[t] prepared to meet evidence specifically designed to counter allegations she had leveled [three] months earlier. Surprise and lack of preparedness are two very different things, and the Court did not abuse its discretion by denying [Jill]'s discovery-related request for continuance when it was occasioned by the latter.

- 29 -

Be that as it may, most of the facts [Jill] sought to learn through discovery were in fact established at the hearing. [Mary]'s hospice records, supplemented by Darlene Kersey's testimony, detailed [Mary]'s diagnoses, what medications she was taking, and the specific care she was receiving the last few weeks of her life, while James Reed's survey established the actual market value of the home. [Darlene] and [Bob] also testified regarding [Mary]'s finances, asserting that she alone was deciding how to spend her money. [Jill] may still question what was happening with [Mary]'s financial affairs, of course, but once installed as co-executor, she will have access to [Mary]'s account records and will be able to challenge any suspicious activity she might discover; her inability to see those records prior to the July hearing did not preclude her from doing so later should she find evidence of impropriety. It is plain from the record, therefore, that [Jill] was not prejudiced by the Court's denial in any event.

[ ] Nor did the Court abuse its discretion when it denied [Jill]'s request to enter the subject property to secure a second appraisal. As of July 12, 2021 — the date she filed her *omnibus* discovery motion — [Bob] held legal title to the property, which had been the subject of a professional appraisal the year before. [Jill] suspected based solely on her perception that Mr. Reed was "a colleague of [Bob's] real estate agent wife[ ]" that he skewed the results of the appraisal so as to favor [Bob]. Unsupported even in the pleadings by facts from which the Court could reasonably infer Mr. Reed's bias, though, her suspicion did not warrant an order authorizing one or more uninvited persons to enter property [Bob] had presumptively acquired lawfully. The Court thus acted well within its discretion in denying her request.

Orphans' Ct. Op., 9/20/21, at 2-3 (footnote omitted)

We again agree with the orphans' court's rationale. Jill filed her petition on April 21, 2021, and then waited until July 12, 2021, to file the continuance request. At that time, Jill was fully aware of Bob's position as he had filed a response on May 24th, and the parties had already met on June 21st and agreed to schedule the evidentiary hearing for July. Jill's failure to appreciate the implications of the allegations set forth in her own petition and

- 30 -

consequently, the failure to prepare evidentiary support are the result of her own doing. As the court pointed out, this was not a surprise attack, but rather, amounted to a lack of preparedness on her part. **See** Orphans' Ct. Op., 9/20/21, at 2. Therefore, we conclude that the court did not abuse its discretion in denying her discovery-related continuance request.[9] Moreover, Jill's argument regarding the court's denial of her request to enter the property does not persuade us otherwise. Jill already took issue with the fact that the amount Bob paid for the property was below the initial appraisal amount — she does not explain why an additional appraisal would be necessary. Accordingly, this issue fails.

In Jill's next argument, she alleges the orphans' court abused its discretion by denying her request that her two sibling beneficiaries testify remotely. Jill's Brief at 40. Relying on a June 30, 2021, recommendation made by the Administrative Office of Pennsylvania Courts and Pennsylvania Conference of State Trial Judges Remote Proceeding Task Force, Jill argues that Bob would not be prejudiced by having two of his siblings testify remotely and that they were exactly the type of witnesses referenced in the Task Force's

---

[9] **See Kerns v. Methodist Hosp.**, 574 A.2d 1068, 1074 (Pa. Super. 1990) (affirming denial of a non-moving party's request for a discovery continuance after a summary judgment motion was filed, where adequate time for discovery had already expired and the requesting party failed to show due diligence in seeking discovery and information material to their case).

recommendation "who should be granted leave to testify remotely in an otherwise in-person proceeding." *Id.* at 42-43.

Here, the orphans' court explained its denial of Jill's request as follows:

> The Court did not abuse its discretion in disallowing the proposed witnesses to testify remotely. [Trish], as it turned out, was able to attend the rescheduled hearing, and there is nothing in the record to indicate that Timothy Beidl's testimony was in any way essential for [Jill] to prove her allegations. [Jill] made no proffer, for instance, regarding what admissible, non-cumulative evidence he may have offered,[1] and nothing she or Ms. Moore said suggested that their distant brother would have been able to speak more knowledgeably or authoritatively about any of the factual questions undergirding her request to have [Bob] removed as co-guardian.
>
> _____
>
> [1] Because [Bob]'s attorney was vigilant about objecting to hearsay evidence and testimony rendered incompetent by the Dead Man's Act, the Court can reasonably presume that [Timothy] would not have had the opportunity to share with the Court any statements [Mary] may have made to him.

Orphans' Ct. Op., 9/20/21, at 1-2.

We agree with the court there is no support for Jill's remote testimony challenge. Indeed, Trish attended and testified at the July 19th hearing so Jill did not suffer any prejudice with respect to her testimony. Moreover, other than a bald assertion, Jill fails to explain how Timothy's purported testimony would amount to any more than repetitive to the averment already made at the hearing that he joined Jill and Trish in their concerns that Bob be removed as a co-executor. *See* N.T. at 190-91. Jill's reliance on the Task Force's recommendation is misplaced where there was a considerable number of

witnesses and testimony regarding the issue, and Timothy's testimony would have been cumulative. Accordingly, this claim fails.

In her penultimate assertion, Jill complains the court abused its discretion in denying her petition for a protective order pursuant to Rule 4012. **See** Jill's Brief at 44. Jill first reiterates her assertion that the court "crossed out the portion of [her] initial proposed order appended to her Petition referring to the timeframe for depositions to take place as a part of its very first order in the instant case[,]" but then notes that Bob was able to depose Abrahamson. **Id.** She states that she filed the petition for the protective order

> raising therein the *de facto* burden of [Bob]'s failure to provide her the requisite 'reasonable notice' per Pa.R.C.P. 4007.1, her counsel's inability to attend upon such short notice, the fact that the requested testimony was inappropriate even under Pa.R.C.P. 4020(a)(5) due to the inclusion of hearsay, the issue that the [orphans' c]ourt's first order . . . included its crossing out of a provision for a period of depositions, and that literally the day prior[,] the [orphans' c]ourt had denied [her] request to establish a discovery period wherein depositions could take place.

**Id.** at 45. By allowing Abrahamson's deposition to take place based on a pre-planned vacation excuse, Jill states that the court's action constituted "the quintessential example of manifest bias, and misapplication of the applicable law." **Id.** at 46.

Rule 4012 provides, in pertinent part:

(a) Upon motion by a party or by the person from whom discovery or deposition is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person

from unreasonable annoyance, embarrassment, oppression, burden or expense, including one or more of the following:

(1) that the discovery or deposition shall be prohibited[.]

Pa.R.C.P. 4012(a)(1).

Here, the orphans' court found the following:

[Bob] deposed and presented Ms. Abrahamson, [Mary]'s treating physician assistant, as a fact witness, not an expert medical witness. That being the case, [Jill] was not denied the opportunity to learn the substance of her testimony via a written report or to review any documents upon which she relied ahead of time, her only right being to cross-examine Ms. [Abrahamson] and review those records at the time she testified. What occurred at an off-site location [three] days before the hearing, therefore, was fully equivalent to what would have occurred in the courtroom on July 19. Whereas there was nothing improper about the deposition itself, moreover, it was no more error for the Court to consider Ms. [Abrahamson]'s testimony as transcribed by the court reporter than it would have been had she appeared live in court. ***See also*** "Order Disposing of Objections," 08/06/2021, ¶ 1 (ruling on [Jill]'s objection to the deposition's occurrence).

Orphans' Ct. Op., 9/20/21, at 3.

We concur with the orphans' court's conclusion. First, we note Jill appears to misinterpret the court's act of crossing out the timeframe for depositions in her proposed order, which was attached to her petition, as a sign that she, herself, could not take any depositions or that discovery was not permitted in this matter. In reviewing the April 22, 2021, order, one can infer that the court was concerned with scheduling oral argument. ***See*** Order, 4/22/21. The court's order did not signify that Jill could not pursue any type of evidentiary investigation. Second, as the court explained when it disposed of Jill's objections, it permitted the deposition pursuant to Pa.R.C.P. 4007.2

(relating when a deposition may be taken without leave of court) due to Abrahamson's scheduling conflict, and Jill did not establish "unreasonable annoyance, embarrassment, oppression, burden, or expense . . . so as to justify requiring Ms. Abrahamson's appearance in Court." Order Disposing of Objections, 8/6/21, at 1. Moreover, Jill's counsel was present at the deposition and was provided with the opportunity to cross-examine Abrahamson and raise objections. *Id.* One cannot conclude that Jill or her counsel was unprepared for the deposition or that the court's actions could be construed as a manifest bias or misapplication of the law. Accordingly, we find this claim has no merit.

Lastly, Jill contends the court erred by admitting Mary's records from Penn Highlands Community Nurses Hospice without the authors of those documents being available for cross-examination. Jill's Brief at 46. Jill states that while the parties stipulated "that the custodian of said records [need not] appear to testify in person to authenticate same as the records kept by the provider[,]" the records are "voluminous," and contain "complex and opaque medical jargon not within the ken of a layperson. . . ." *Id.* at 46-47. She further alleges "it is entirely unclear . . . as to how assessments of [Mary] were made, and who actually provided answers to treatment providers' questions regarding [Mary]'s status." *Id.* at 47. Relying on *Walsh v. Kubiak*, 661 A.2d 416 (Pa. Super. 1995) (*en banc*), she contends that the testimony

of the authors of the records is necessary to explain their medical opinions, and the court erred by admitting them. Jill's Brief at 48.

We consider the relevant standard of review:

> [I]t is well settled that the admissibility of evidence is a determination left to the sound discretion of the trial court, and it will not be overturned absent an abuse of discretion or misapplication of law. For a ruling on the admissibility of evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*In re Fiedler*, 132 A.3d 1010, 1025 (Pa. Super. 2016) (*en banc*) (citation & quotation marks omitted).

> [H]earsay is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted. For hearsay purposes, the declarant is defined as the person who makes the out-of-court statement, not the person who repeats it on the witness stand. Generally, hearsay is inadmissible because it is deemed untrustworthy since it was not given under oath and subject to cross-examination. However, the law recognizes that there are some circumstances attendant to the making of out-of-court statements that provide sufficient guarantees of their trustworthiness to depart from the requirement that the declarant be subject to cross-examination. That is the rationale underpinning exceptions to the hearsay rule. Thus, it is burden of the proponent of hearsay evidence to convince the court of the admissibility of the evidence under an exception before such testimony will be admitted.

*Adams v. Rising Sun Med. Ctr.*, 257 A.3d 26, 35-36 (Pa. Super. 2020) (citations & quotation marks omitted).

"Hospital records are generally admitted at trial as an exception to the hearsay rule under the Uniform Business Records as Evidence Act." *Commonwealth v. Seville*, 405 A.2d 1262, 1264 (Pa. Super. 1979) (footnote omitted). The *Walsh* Court stated: "Although hospital records are

admissible under the business records exception to the hearsay rule to show the fact of hospitalization, treatment prescribed, and symptoms found, medical opinion contained in such records is not admissible where the doctor who offered the opinion is not available for cross examination." **Walsh**, 661 A.2d at 421 (citations omitted).

Turning to the present matter, the orphans' court explained its rationale for admitting the records as follows:

> The Court did not err either in admitting or considering [Mary]'s hospice records. They were plainly admissible as substantive evidence pursuant to Pa.R.Evid. 803(6) and, having been properly certified, were self-authenticating. The only question, therefore, was how much weight the Court should give them without having heard explanatory testimony. [Jill] suggested — and still maintains — that they were too technical to possess any real evidentiary value independently, but the Court did not and does not agree. On the contrary, [Mary]'s condition and progress were largely recorded in plain English, and the "medical jargon" upon which the Court relied, e.g., the terms "alert" and "oriented x 4," were so commonly understood as to render interpretive testimony superfluous. The Court thus did not err or abuse its discretion in relation to the hospice records.

Orphans' Ct. Op., 9/20/21, at 3-4.

We conclude that the orphans' court did not err by admitting Mary's hospice records for the limited purpose of assessing Mary's condition. The language used in records referenced **facts** as to Mary's condition, not the treating physician's opinion, and could easily be understood by a layperson. Hence, the orphans' court properly considered the records as admissible evidence. Accordingly, Jill's final claim fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  11/29/2022